RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────────

BLAKE CRETACCI,

　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v.*

JOE CALL; BRIAN KEITH; JARED NELSON; JESSE HARDEN; CODY FOUST; COFFEE COUNTY, TENNESSEE,

　　　　　　　　　　*Defendants-Appellees*.

No. 20-5669

───────────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 4:16-cv-00097—Christopher Harper Steger, Magistrate Judge.

Argued:  January 12, 2021

Decided and Filed:  February 17, 2021

Before:  SUHRHEINRICH, McKEAGUE, and READLER, Circuit Judges.

───────────────────

## COUNSEL

**ARGUED:**  Drew Justice, JUSTICE LAW OFFICE, Murfreesboro, Tennessee, for Appellant. Darrell G. Townsend, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees. **ON BRIEF:**  Drew Justice, JUSTICE LAW OFFICE, Murfreesboro, Tennessee, for Appellant. Darrell G. Townsend, Nicholas A. Lastra, HOWELL & FISHER, PLLC, Nashville, Tennessee, for Appellees.

　　　McKEAGUE, J., delivered the opinion of the court in which SUHRHEINRICH and READLER, JJ., joined.  READLER, J. (pp. 13–17), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  Blake Cretacci sued Coffee County and Coffee County Jail Deputies Joe Call, Brian Keith, Jared Nelson, Jesse Harden, and Cody Faust ("Appellees") pursuant to 42 U.S.C. § 1983 for constitutional violations that occurred while Cretacci was a pretrial detainee at Coffee County Jail.  The district court granted summary judgment in favor of Appellees, finding that two claims were barred by the statute of limitations and that there were no constitutional violations underlying the remaining two claims.

The untimely claims implicate the issue of whether the prison mailbox rule applies to prisoners who are represented by counsel, an issue of first impression in the Sixth Circuit.  A majority of circuits have declined to extend the rule to represented prisoners, finding that the rule established in *Houston v. Lack*, 487 U.S. 266 (1988), is premised on the relaxed procedural requirements traditionally afforded to pro se prisoners who have no choice but to rely on the prison authorities to file their pleadings.  We agree and hold that, in the context of filing civil complaints in federal court, the prison mailbox rule applies only to prisoners who are not represented by counsel.

Finding no error in the district court's judgment, we **AFFIRM**.

**I.**

Cretacci's claims arise from three separate incidents occurring on three separate days—September 29, 2015, October 11, 2015, and January 14, 2017—while Cretacci was a pretrial detainee at the Coffee County Jail.

On September 29, 2015, three inmates in the BC pod[1] of the Coffee County Jail—Jeremy Mathis, BJ Murray, and Josh Byford—decided to lead a "peaceful riot" to protest the conditions in the jail.  The three ringleaders of the riot told the other inmates that if they refused to

———————————

[1]"The pod is one large room, referred to as the dayroom, with a two-story ceiling."  Officers refers to pods as letters, such as BA, BB, BC and BD.

participate they would be beaten up. The riot involved inmates refusing to return to their cells for lockdown when instructed. Cretacci, who was housed in the BC pod, did not want to participate in the riot but took the threats of the ring leaders seriously, so he did not return to his cell. When officers entered the pod, they grabbed Cretacci and put him on the floor. While Cretacci was on the ground, he was struck twice with pepperballs. Cretacci also alleges that after the incident the water in the sinks and toilets of the cells were turned off for at least three days, that the inmates were denied toilet paper, and that they were not allowed to shower.

After the September 29 riot, Cretacci wanted to be moved to a different pod, but never submitted a written request. Instead, Cretacci told multiple officers that he "need[ed] to get out of [the] pod," but he does not remember to whom he said it. Cretacci "would just say it out loud," to "[a]ny cop that came in pretty much at certain times." Cretacci does not recall telling any officers that he feared for his safety, because he was not "afraid of these three people," but remembers telling officers that "[the] pod is crazy," and that "[t]hese people are nuts. I need to get out of this pod. You guys need to move me into another pod."

Early in the morning on October 11, 2015, the three ringleaders of the riot were in the dayroom talking loudly. Cretacci walked out of his cell to ask them to be quiet and then returned to his cell. A few minutes later, Mathis came into Cretacci's cell and assaulted him. Cretacci was able to "hit [Mathis] out the door" and back into the dayroom, but Byford and Murray then came to Mathis's assistance, and the three of them attempted to push Cretacci back into his cell. Cretacci forced his way out into the dayroom and "started to have more words with" his assailants. When the four of them got out into the dayroom, officers entered the pod and Cretacci walked back into his cell. The physical fighting had ended before the officers came in. The officers asked Cretacci what happened, and Cretacci replied: "I don't know what the f*** is going on." The officers spoke to Mathis, Murray, and Byford in the dayroom, but Cretacci could not hear what they said. After the officers left the pod, Mathis, Murray, and Byford threatened to kill Cretacci.

Thirty minutes later, breakfast was served. Cretacci grabbed his tray of food and set it down on the table. Cretacci then went into his cell to grab his spoon and Mathis followed him. Mathis hit Cretacci and Cretacci fell to the floor. Mathis punched Cretacci "four or five times"

and then left the cell.  Cretacci got up and started walking back to the table when Officer Keith came up behind him, grabbed him, and put him up against the wall to keep him from being assaulted.  Officers Keith and Call took Cretacci to the medical unit for examination.  Cretacci was then permanently transferred to the AD pod.

Officer Call's incident report stated that "a verbal altercation began with Inmates Mathis, Byford, Murray, and Cretacci, regarding a conflict that started this morning around [6:00 a.m.]." Officer Call testified that he learned about the 6:00 a.m. altercation when he spoke to Cretacci after removing him from the pod.

On January 14, 2017, corrections officers overheard an inmate threaten to stab another inmate in the AD pod, where Cretacci was housed.  Officer Faust ordered Officer Dubicki to make an announcement over the loudspeaker in the dayroom of the AD pod instructing the inmates to lie on their stomachs.  Officer Faust heard Officer Dubicki give this order, but Cretacci did not.[2]  Officer Dubicki observed that the inmates were not complying with his order and alerted Officer Faust.  Officer Faust and five other officers then entered the pod, and Officer Faust repeated Officer Dubicki's order to get on the ground.  Cretacci was sitting in the dayroom playing chess when he saw the officers enter the pod and heard Officer Faust's order.  Cretacci did not comply with the order, so Officer Foust fired pepperballs towards Cretacci.  Cretacci alleges he was hit once or twice on the arm.  Cretacci then stood up from his chair and began yelling at the officers, so Officer Foust ordered him to lay down.  When Cretacci refused, Officer Foust again launched pepperballs towards Cretacci, hitting him once on the back.  Cretacci then finally complied and laid back down on the floor.

Cretacci secured an attorney, Andrew Justice, to represent him in a lawsuit against the jail.  Justice drafted a complaint and intended to file it electronically, but on the evening of September 28, 2016, the day before the statute of limitations expired on Cretacci's claims stemming from the September 29, 2015 incident, Justice realized he was not admitted to practice law in the district that encompassed Coffee County Jail, the Eastern District of Tennessee. Justice was only admitted in the Middle District of Tennessee, where he mistakenly believed

---

[2]In a declaration, Cretacci stated: "the dayroom does not have a loudspeaker."  It is not clear whether he was referencing the dayroom in the BC pod, the AD pod, or speaking generally about all the jail's pods.

Coffee County Jail was located.  The next day, Justice looked into being admitted into the Eastern District pro hac vice so that he could electronically file the complaint, but did not think he could complete the requirements in time.  Accordingly, Justice drove to the Winchester courthouse in the Eastern District to attempt to file the complaint in person.  However, the Winchester courthouse does not have a staffed clerk's office and documents cannot be filed in-person there.  Justice determined he would not be able to drive to the Chattanooga courthouse before it closed, so instead he took the complaint to Cretacci at the Coffee County Jail for Cretacci to file.  Justice gave Cretacci an envelope stamped and addressed to the Chattanooga courthouse and told him to deliver it to the correctional officers immediately, explaining that because he was an inmate, he could take advantage of the prison mailbox rule, which allows inmate filings to be assessed for timeliness on the day they are handed over to the jail authorities rather than on the day the district court receives them.  Cretacci did so on the night of September 29, and the district court received the complaint on October 3.  Justice monitored the case on PACER, and on November 22, 2016, Justice was admitted pro hac vice into the Eastern District. He entered his appearance in the case that same day.

Plaintiff's complaint alleged three counts under 42 U.S.C. § 1983: a deliberate indifference claim against Officers Call, Keith, Nelson, Harden and Coffee County[3] for the assaults that occurred on October 11, 2015; an excessive force claim against Coffee County arising from the September 29, 2015 riot; and a claim against Coffee County for failure to "distribute essential supplies to the inmates" after the September 29, 2015 riot.  After the January 14, 2017 incident, Cretacci amended his complaint to include Count IV, alleging excessive force against Officer Faust and Coffee County.[4]

Defendants moved for summary judgment, arguing that Counts II and III were barred by the statute of limitations because Cretacci was represented by counsel when he filed his complaint and therefore could not benefit from the prison mailbox rule, and that there were no

---

[3]Cretacci withdrew his deliberate indifference claim against Coffee County.

[4]Count IV alleges Coffee County is also responsible for Officer Faust's use of excessive force, but Cretacci has withdrawn that argument on appeal.

constitutional violations underlying Counts I and IV. The district court agreed and granted summary judgment in full in favor of Defendants. Cretacci now appeals.

**II.**

In *Houston v. Lack*, the Supreme Court held that notices of appeal from pro se prisoners are considered filed when the prisoner delivers the notice to prison authorities for mailing. 487 U.S. 266, 270 (1988). This is now known as the prison mailbox rule.[5] In adopting the rule, the Court emphasized the unique challenges faced by pro se prisoners seeking to appeal: they cannot travel to the courthouse to file the notice, they cannot place the filing "directly into the hands of the United States Postal Service" and track its progress, nor "do they have lawyers who can take these precautions for them." *Id.* at 271. Because pro se prisoners are "[u]nskilled in law, unaided by counsel, and unable to leave the prison," they have "no choice but to entrust the forwarding of [their] notice of appeal to prison authorities whom [they] cannot control nor supervise and who may have every incentive to delay." *Id.*

The prison mailbox rule has since been extended in some circuits to apply to filings other than notices of appeal. *See, e.g.*, *Richard v. Ray*, 290 F.3d 810, 813 (6th Cir. 2002) (per curiam) (civil complaints); *Jones v. Bertrand*, 171 F.3d 499, 501–02 (7th Cir. 1999) (habeas corpus petitions); *In re Flanagan*, 999 F.2d 753, 755 (3d Cir. 1993) (appeals of bankruptcy order); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir. 1999) (administrative filings under the Federal Tort Claims Act). Following the amendment to Federal Rule of Appellate Procedure 4, the Fourth and Seventh Circuits have also applied the mailbox rule to prisoners represented by counsel in the context of a notice of appeal in criminal proceedings. *See United States v. Moore*, 24 F.3d 624, 626 (4th Cir. 1994); *United States v. Craig*, 368 F.3d 738, 740 (7th Cir. 2004). *But see Rutledge v. United States*, 230 F.3d 1041, 1052 (7th Cir. 2000) (declining to extend the prison mailbox rule to a motion to amend filed by a represented inmate).

---

[5]The prison mailbox rule applicable to the filing of a notice of appeal was later codified in the Federal Rules of Appellate Procedure. *See* Fed. R. App. P. 4 advisory committee's note to 1993 amendment. Today, that Rule states, in relevant part: "If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing." Fed. R. App. P. 4(c)(1).

Cretacci first argues that he should receive the benefit of the prison mailbox rule because he was not represented by Justice when he filed his complaint. In the alternative, if he was represented, Cretacci asks this Court to extend the application of the prison mailbox rule to prisoners proceeding with assistance of counsel. We address each argument in turn.

**A.**

Cretacci was not proceeding without assistance of counsel. Justice and Cretacci had an explicit attorney-client relationship in which Justice agreed to represent Cretacci in his lawsuit against the jail. Importantly, Justice developed Cretacci's case against Coffee County, identified the proper legal causes of action to bring, and wrote the complaint. When an attorney agrees to represent a client and then prepares legal documents on his behalf, the client is not proceeding without assistance of counsel. *See* Tenn. Code Ann. § 23-3-101(3) (defining "practice of law" as "the appearance as an advocate in a representative capacity or the drawing of papers, pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or prospective before any court"); *see also Stillman v. LaMarque*, 319 F.3d 1199, 1200–01 (9th Cir. 2003) (using California's definition of practicing law, "the preparing of legal documents and the giving of legal advice," to hold that prisoner was represented for the purposes of the prison mailbox rule because an attorney prepared and filed a habeas petition on his behalf, despite the attorney's specific admonition that she would not "assume responsibility for representing him").

And the fact that Cretacci himself filed the complaint does not lead to a different result. Justice attempted to file the complaint several times, and only when those attempts proved unsuccessful, advised Cretacci to file it with prison officials in an effort to trigger the prison mailbox rule. Moreover, Justice's and Cretacci's attorney-client relationship did not end after Justice drafted the complaint. Justice represented Cretacci throughout the proceedings at the district court and continues to represent him here on appeal. *See Stillman*, 319 F.3d at 1201 n.3 ("Our conclusion that a lawyer-client relationship existed is buttressed by the fact that [the prisoner's] lawyer later assisted him with numerous other legal matters.").

We affirm the district court's finding that Cretacci was represented by counsel when he filed his complaint. Thus, we turn now to the question of whether represented prisoners can take advantage of the prison mailbox rule.

**B.**

The majority of circuits have declined to extend the prison mailbox rule to prisoners proceeding with counsel.[6] These circuits reasoned that the rationale of *Houston* was premised on the plight of pro se prisoners specifically, who have no means to file legal documents except through the prison mail system and who cannot monitor the status of their mailings to ensure timely delivery. *See, e.g.*, *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002); *United States v. Camilo*, 686 F. App'x 645, 646 (11th Cir. 2017). Represented prisoners, on the other hand, are not dependent on the prison mail system and can rely on their attorneys to file the necessary pleadings on time. *See Burgs v. Johnson County*, 79 F.3d 701, 702 (8th Cir. 1996) (per curiam); *United States v. Rodriguez-Aguirre*, 30 F. App'x 803, 805 (10th Cir. 2002).

The two circuits that have extended the prison mailbox rule to represented prisoners did so in the context of notices of appeal, not the filing of civil complaints, and relied on the text of Federal Rule of Appellate Procedure 4, which was amended after *Houston* to add subsection (c). Rule 4, these circuits reasoned, does not distinguish between pro se and represented prisoners: "If an inmate files a notice of appeal . . . [it] is timely if it is deposited in the institution's internal mail system on or before the last day for filing." *See Moore*, 24 F.3d at 626; *Craig*, 368 F.3d at 740.

We agree with the majority of circuits. The prison mailbox rule was created to prevent pro se prisoners from being penalized by any delays in filing caused by the prison mail system. But if a prisoner does not need to use the prison mail system, and instead relies on counsel to file a pleading on his or her behalf, the prison is no longer responsible for any delays and the

---

[6]These circuits have concluded in contexts other than the one we consider today (the filing of a civil complaint) that the mailbox rule does not apply to represented prisoners. *See Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002) (habeas petition); *Rutledge*, 230 F.3d at 1052 (motion to amend); *Burgs v. Johnson County*, 79 F.3d 701, 702 (8th Cir. 1996) (per curiam) (notice of appeal); *Stillman*, 319 F.3d at 1201 (habeas petition); *United States v. Rodriguez-Aguirre*, 30 F. App'x 803, 805 (10th Cir. 2002) (habeas petition); *United States v. Camilo*, 686 F. App'x 645, 646 (11th Cir. 2017) (filings objecting to a plea agreement and prison sentence).

rationale of the prison mailbox rule does not apply. And because this case is not governed by Appellate Rule 4(c), it is readily distinguished from *Moore* and *Craig*.

Accordingly, we hold that, in the context of the filing of civil complaints, the prison mailbox rule applies only to prisoners who are not represented by counsel and are proceeding pro se.

## III.

We turn now to the merits of Cretacci's constitutional claims. This Court reviews a district court's grant of summary judgment de novo, "viewing all the evidence in the light most favorable to the nonmoving party and drawing 'all justifiable inferences' in his favor." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The central question is "whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).

## A.

In Counts II and III, Cretacci brings claims for excessive force and for failure to "distribute essential supplies to the inmates" against Coffee County for the events arising from the September 29, 2015 riot and the three subsequent days. Because Cretacci cannot take advantage of the prison mailbox rule, his complaint was filed on October 3, 2016, when it was received by the district court. Counts II and III are therefore barred by the statute of limitations, which expired on September 29, 2016, or October 2, 2016, at the latest. *See* Tenn. Code Ann. § 28-3-104(a)(1); *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634–35 (6th Cir. 2007).

## B.

In Count I, Cretacci alleges that Officers Call, Keith, Nelson, and Harden showed deliberate indifference to his safety when they allowed him to be attacked by Mathis, Murray, and Byford on October 11.

Cretacci has the burden of "presenting evidence from which a reasonable juror could conclude that the individual defendants were deliberately indifferent to a substantial risk of serious harm to [him] and that they disregarded that risk by failing to take reasonable measures to protect him." *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Cretacci must satisfy both an objective component and subjective component: (1) that the risk of harm was objectively, sufficiently serious, and (2) that "'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' . . . the official 'did in fact draw the inference,' and . . . the official 'then disregarded that risk.'" *Id.* (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)); *accord Roberts v. Coffee County*, 826 F. App'x 549, 552 (6th Cir. 2020).

Cretacci cannot satisfy the subjective component. Cretacci has not put forth any evidence that Appellee officers knew that Cretacci was attacked by Mathis, Murray, and Byford at 6:00 a.m. before breakfast. Cretacci himself testified that the physical violence had ended by the time the officers entered the pod. And when the officers asked Cretacci what had happened, he did not tell them that he was assaulted, instead replying that he had no idea what was going on. Cretacci argues that because Officer Call's incident report referenced the 6:00 a.m. attack, Officer Call must have been aware of the attack before Cretacci was assaulted for the second time. But Officer Call testified that he received that information from Cretacci after removing him from the pod, and Cretacci has not offered any evidence to the contrary.

Cretacci also argues that the district court erred by basing its holding on the fact that "the guards could not have seen the fight because the cell door was closed." But the district court did not make such a finding. In its order granting summary judgment, the court wrote: "the cell has a solid door except for a very narrow window. There is no evidence that the officers could see inside the cell when the first assault happened." And the court did not base its holding on the fact that the officers could not have seen through the small window. It found that the officers did not perceive facts from which to infer Cretacci was at risk of serious harm because Cretacci presented no evidence that the officers had seen the fight, especially considering that Cretacci testified that when the officers entered the pod, the inmates were in the dayroom and the fight was only verbal.

Thus, because Cretacci failed to provide evidence showing that the officers perceived facts from which they could infer Cretacci was at risk of being assaulted, we affirm the district court's grant of summary judgment to Appellees on Count I.

**C.**

In Count IV, Cretacci alleges that Officer Faust used excessive force when he struck Cretacci with pepperballs on January 14, 2017 following the security threat in which officers overheard an inmate threaten to stab another inmate.

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). To prevail on an excessive force claim, a pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396–97. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case,'" *id.* at 397 (quoting *Graham*, 490 U.S. at 396), including

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Courts must make this totality-of-the-circumstances determination based on what a reasonable officer on the scene knew at the time and account for the jail's legitimate interest in maintaining their facility, "deferring to 'policies and practices that . . . are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

Here, it was reasonable for Officer Faust to use force against Cretacci when he did not obey the order to get on the ground. Based on the threat the officers overheard, Officer Faust had a legitimate interest in maintaining order to prevent violence and protect the inmates. Further, Officer Faust used a non-lethal weapon against Cretacci, a pepperball launcher, which led only to minor injuries—bruises that lasted for a few days.

Cretacci makes much of the fact that he did not hear Officer Dubicki's order to get on the ground over the loudspeaker. He claims that there is an evidentiary dispute over whether the guards even gave such a command, and therefore summary judgment should not have been granted. However, viewing the record in the light most favorable to Cretacci, and assuming no announcement was ever made, it is undisputed that Officer Faust made the announcement when he entered the pod, and Cretacci stated that he heard that order. Moreover, Officer Faust had no reason to believe that Officer Dubicki never gave the order over the loudspeaker because Officer Faust heard it himself.

Cretacci next argues that the second time Officer Faust deployed pepperballs against him was excessive force because Officer Faust did not give him an opportunity to comply with his order. But Cretacci was not in the process of complying with Officer Faust's order when he was hit with a pepperball the second time; he was beginning to stand up and yell at Faust. And "[a]ctive resistance to an officer's command can legitimize" an officer's use of force. *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 531 (6th Cir. 2018) (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)). "Such resistance can take the form of 'verbal hostility' or 'a deliberate act of defiance.'" *Id.* (emphasis omitted) (quoting *Goodwin*, 781 F.3d at 323). Officer Faust did not act unreasonably in hitting Cretacci with a pepperball for a second time after Cretacci actively resisted the order to get on the ground by yelling and standing up.

Considering the totality of the circumstances, Officer Faust did not use excessive force against Cretacci when he did not obey the order to get on the ground. We affirm the district court's grant of summary judgment to Appellees on Count IV.

**IV.**

For the foregoing reasons, we **AFFIRM** the decision of the district court.

_____

**CONCURRENCE**

_____

CHAD A. READLER, Circuit Judge, concurring. I concur in full with the majority opinion. I write separately to emphasize that any rewriting of our federal filing requirements to create exceptions for incarcerated individuals should come from Congress or the Judicial Conference's Committee on Rules of Practice and Procedure, commonly known as the "Standing Committee," rather than individual judges.

1. Including the Supreme Court in *Houston v. Lack*, 487 U.S. 266 (1988), various federal courts have been tinkering with the otherwise clear filing requirements in the respective Federal Rules of Civil and Appellate Procedure. In *Houston*, the Supreme Court effectively rewrote the then-existing versions of Federal Rules of Appellate Procedure 3(a) and 4(a)(1), which together required that a notice of appeal in a civil case "be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from." *Id.* at 272 (quoting Fed. R. App. P. 4(a)(1) (1986)). *Houston* interpreted those Rules to mean that a prisoner, upon handing his notice of appeal to *a prison official*, has "filed his notice . . . [with] *the District Court*." *Id.* at 270 (emphasis added). That creative rewriting of the Federal Rules set the foundation for what has come to be known as the "prison mailbox rule." *See United States v. Smotherman*, 838 F.3d 736, 737 (6th Cir. 2016).

Our Court too has not been shy about rewriting federal filing requirements. Taking our cue from *Houston*, we extended the "mailbox rule" from the notice of appeal setting to instances when "civil complaints [are] filed by pro se petitioners incarcerated at the time of filing." *Richard v. Ray*, 290 F.3d. 810, 813 (6th Cir. 2002) (per curiam). As then-Federal Rule of Civil Procedure 5(e) explained, "[t]he filing of papers with the court as required by these rules shall be made by filing them *with the clerk of court*." Fed. R. Civ. P. 5(e) (2000) (emphasis added). In departing from that plain text to deem a prisoner to have "filed" a complaint with the court simply by handing those papers to a prison official, we invoked the policy concerns "highlighted by the Supreme Court in *Houston v. Lack*." *Richard*, 290 F.3d at 813. Those policy concerns coupled with the notion that "*Houston* gives no indication, in either text or analytical framework,

that it should be limited to the habeas context," seemingly gave us license to ignore the text of Civil Rule 5(e) and overhaul the filing requirements for civil complaints by inmates. *Id.* That is a curious conclusion—and not just because it ignores the Rule's text in favor of a judge's policy preferences. As a matter of interpreting precedent, simply because the Supreme Court cracks open a door in one context does not mean we should kick the door wide open at the next possible opportunity. Today, we understandably curtail any further expansion of this atextual, judge-inspired rewriting of the Federal Rules.

Reason for caution in this setting is further reflected by the fact that *Richard* and cases like it have the potential to upset substantive state law rules. *See* 28 U.S.C. § 2072(b) (requiring that rules of procedure created by the Supreme Court "shall not abridge, enlarge or modify any substantive right"). By allowing a civil complaint to be deemed "filed" before it is received by a court clerk, *Richard* arguably created a tolling amendment to a state's statute of limitations. To be sure, one way to read *Richard* is that it simply interprets the meaning of "filing" under the Federal Rules to include an inmate handing her complaint to a prison official. But another way to understand the decision is that it effectively extends the period for filing set by state law. In *Richard*, Kentucky law required that the inmate's medical malpractice claim be filed within one year of May 20, 1999, yet the complaint was accepted as timely despite being stamped "filed" with the federal district court on May 23, 2000. 290 F.3d at 812–13. In that way, the rule from *Richard* arguably tolled the applicable state statute of limitations.

All of this is to say that, to my mind, it is dangerous practice for federal judges to be rewriting the Federal Rules on their own whims. In addition to potentially undermining principles of state law, doing so effectively implements policy judgments regarding the equities of prisoner litigation. Those policy judgments, however, are better made by subject-matter experts: Congress, or in its absence, the Standing Committee. Especially so, it seems, when federal courts, in making those policy judgments, also "expand and contract the scope of their own competence." *Houston*, 487 U.S. at 279 (Scalia, J., dissenting). Allowing individual judges to rewrite the rules of procedure also undermines the overarching goal of "uniform meaning" for "ordinary statutory deadlines" as well as "court-created rules." *Id.* A contrary patchwork system of federal rules, as *Richard* and other cases invite, has far less appeal. Why, for example, would

we prefer a system in which an unrepresented federal prisoner in Ohio can file her complaint simply by handing it to a prison official, whereas a prisoner in neighboring Pennsylvania cannot? *See Jackson v. Nicoletti*, 875 F. Supp. 1107, 1109–14 (E.D. Pa. 1994) (declining to extend the prison mailbox rule to the filing of a civil complaint). Yet that is the natural result of ad hoc, atextual, court-created filing rules.

2. Despite my disagreement with the process that gave rise to the "mailbox rule," I am not blind to the challenges inmates face in pursuing legal remedies. *See, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383 (2013). Accommodating those challenges when possible, in fact, "makes a good deal of sense." *Houston*, 487 U.S. at 277 (Scalia, J., dissenting). As a policy matter, one can see why a litigant who cannot personally ensure a timely filing with the court should benefit from a filing rule that accounts for her unique circumstance. But reconciling those policy concerns should come from Congress, or, as often occurs, the Standing Committee, whose proposals take effect when, once reported by the Supreme Court, are not altered by Congress in the ensuing seven months. *See* 28 U.S.C. §§ 2071–74; *How the Rulemaking Process Works*, United States Courts, https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Feb. 16, 2021). Just as it was difficult "to understand why the [Supreme] Court" in *Houston* "felt the need to short-circuit the orderly process of rule amendment in order to provide immediate relief in the present case," 487 U.S. at 284 (Scalia, J., dissenting), I share that same confusion over our decision in *Richard*. But I also have reason to believe that the Standing Committee would be up to the task of resolving whether to alter the procedural rules applicable to the filing of civil complaints by incarcerated individuals.

Indeed, one need look no further than the Standing Committee's amendment to Appellate Rule 4, which accommodated the challenges an inmate faces in filing a notice of appeal. *See* Fed. R. App. P. 4 advisory committee's note to 1993 amendment. Rule 4(c) now provides: "If an inmate files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing." Fed. R. App. P. 4(c) (2019). In enacting amended Rule 4, the Standing Committee was also able to address relevant considerations unaddressed by *Houston*, for example, how an inmate certifies

the date of filing, and how the mailbox rule affects when other parties' time to file an appeal begins to run. *See id.*

A similar process would provide uniform direction on whether to extend the "mailbox rule" to the filing of a civil complaint. *Cf. Smith v. State*, 47 A.3d 481, 487 (Del. 2012) (referring the issue to the state rules committee to consider whether the court system "should consider adopting the prison mailbox rule as a rule of procedure"). Unlike a panel of appellate judges, the Standing Committee may study a proposed rule's impact, hear from interested constituencies, consult experts, and then debate whether a rule amendment ultimately should be adopted. That process also affords Congress a voice, as all new proposed rules must be submitted to Congress for review before enactment. 28 U.S.C. § 2074. And it has the benefit of uniformity. *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 202 (1988) (explaining that a "uniform rule" preserves "operational consistency and predictability"); *Hanna v. Plumer*, 380 U.S. 460, 472 (1965) ("One of the shaping purposes of the Federal Rules is to bring about uniformity in the federal courts by getting away from local rules." (citation omitted)). The Standing Committee stepping in would also surely curtail the temptation for judges to tinker with our otherwise uniform rules of procedure.

3. Were the Standing Committee, following its review, inclined to extend the prison mailbox rule to a prisoner's filing of a civil complaint, it should consider doing so irrespective of whether that inmate is represented. As today's case reflects, any other approach seemingly leaves judges with the unenviable task of determining whether an inmate was "represented" at the time of filing. Which, as this case and others demonstrate, is often no easy task. *See, e.g.*, *Stillman v. LaMarque*, 319 F.3d 1199, 1201 & n.3 (9th Cir. 2003). Is an inmate "represented," for instance, if her counsel is not admitted in the state in which the inmate's case must be filed? Or if she has consulted with a lawyer only informally? Or with a family member with a law degree who has offered to assist the inmate, but not to formally represent her? And the seemingly obvious solution for an inmate in this circumstance—a solution that may well have saved Cretacci's complaint here—would be for the inmate to fire her counsel immediately before she turns her complaint over to a prison official. After all, that ostensibly would leave the inmate

unrepresented, and thus free to avail herself of the prison mailbox rule. *See Richard*, 290 F.3d at 813.

This is the approach the Standing Committee followed in revising Federal Rule of Appellate Procedure 4. By its plain terms, Rule 4(c)'s articulation of the mailbox rule applies to "an inmate," whether pro se or represented, when she files a notice of appeal. *See United States v. Craig*, 368 F.3d 738, 740 (7th Cir. 2004) (Easterbrook, J.) ("A court ought not pencil 'unrepresented' or any extra word into the text of Rule 4(c), which as written is neither incoherent nor absurd."); *United States v. Moore*, 24 F.3d 624, 626 & n.3 (4th Cir. 1994) (applying the prison mailbox rule to a represented inmate and recognizing its holding to be "consistent" with the amendment to Rule 4). Taking that same approach here would instill a bright-line rule that asks only whether the litigant filing the complaint is an inmate, not whether the inmate is also unrepresented. *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1178–80 (1989) (recognizing bright-line rules as advantageous because they create predictability and consistency, provide assurance to litigants that their case was decided fairly, and constrain judges from indulging their personal preferences). Doing so would avoid tasking courts with resolving thorny questions of representation. And it would avoid incentivizing inmates to game the system as to whether they were represented at the time of filing.

Of course, there may well be other considerations at play. This is simply one judge's view. But that give and take can be debated by the Standing Committee, if it so chooses. Better them, as I see it, than us.