NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0037n.06

Case No. 25-5632

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 21, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOSHUA AARON ELSWICK, | ) | |
| Plaintiff-Appellant, | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| RYAN DERROUGH, Individual Capacity, | ) | KENTUCKY |
| Defendant-Appellee. | ) | |
|  | ) | OPINION |
|  | ) | |

Before: COLE, MATHIS, and HERMANDORFER, Circuit Judges.

**MATHIS, Circuit Judge.** Officers arrested Joshua Elswick outside of his home after a quarrel with his wife. At the jail, he grew increasingly paranoid that the deputies wanted to kill him, so he fought them off. In response, Deputy Ryan Derrough shocked him with a low-level device. Afterward, Elswick sued the deputy in his individual capacity under 42 U.S.C. § 1983 for excessive force and deliberate indifference. The district court granted summary judgment to Deputy Derrough. We affirm.

**I.**

On September 3, 2022, Joshua Elswick's wife called 911 to report a domestic dispute. Elswick suffers from paranoid schizophrenia, bipolar disorder, and intermittent explosive-impulse-control disorder. His wife reported that he was high on methamphetamines and tearing their house apart.

Officers responded to the incident. When they arrived at his home, Elswick was standing outside, visibly agitated and intoxicated. He said he was depressed and wanted help. So Officer Jim Puszert called for an ambulance.

Once inside the ambulance, Elswick became increasingly combative. He was paranoid that everyone was trying to kill him. He refused treatment, destroyed medical equipment, and swung at medical workers. When he tried to flee, the officers forced him to the ground, where he tried to bite Officer Puszert. Unable to restrain him, the officers tased and handcuffed him. They took Elswick to the local hospital, where they put him in leg restraints. He was treated, evaluated, and cleared for transport to the county jail.

When they arrived at the jail, Officer Puszert escorted Elswick into the booking room with a cup of water. He instructed Elswick to sit and wait while he did the booking paperwork. Deputy Jailer Ryan Derrough watched their interaction on the surveillance video. Because Elswick had his hands cuffed in the front and wore leg shackles, Deputy Derrough wondered if Elswick was combative during his arrest. He joined Officer Puszert in the booking room to find out. There, he read Elswick's arrest citation, which confirmed his suspicions. Deputy Derrough reminded Elswick to stay seated and then left the room to observe from the surveillance video.

As Officer Puszert finished the paperwork, Elswick appeared agitated. He kept looking out the door and, when Officer Puszert looked away, he stood up to bang on it. Deputy Derrough returned to the room with Deputy Bleuel to formally take Elswick into custody. Before they could do so, they explained that they had to remove his handcuffs and leg shackles. Elswick refused— he was still paranoid they were going to kill him. Due to his statements, his intoxication, and his resistance during arrest, Deputy Derrough called for backup and the nurse.

- 2 -

Deputy Vincent came to assist with the generated low-output voltage emitter ("GLOVE"), a compliance tool that emits low levels of force. The GLOVE is comprised of two devices—one worn on each hand. Unlike a taser, the GLOVE is not meant to incapacitate or subdue anyone by weakening large muscle groups; it has a single setting designed to make someone feel just unwell enough to stop resisting, and it achieves this effect only through GLOVE-to-skin contact. Deputy Derrough was the only person on the scene trained to use the GLOVE, so he put it on.

With the GLOVE on but deactivated, Deputy Derrough continued to try deescalating the situation. A nurse reviewed Elswick's paperwork and checked him for injuries. Deputy Noce also came to provide additional assistance. When Deputy Bleuel tried to search him, Elswick sat down, refused to face the wall, and repeated that they were trying to kill him.

Deputy Derrough activated his GLOVE and contacted Elswick over his clothes without shocking him. When Elswick finally turned to face the wall, Deputy Derrough touched his upper back, again over his shirt. Deputy Bleuel tried to remove Elswick's handcuffs, but he turned back around and sat down. Deputy Derrough redirected Elswick back toward the wall without shocking him. As Deputy Bleuel bent down to remove the leg restraints, Elswick pushed off the wall, flipped around, sat down, and tried to pull away.

Deputy Derrough finally grabbed Elswick's bare forearm with the GLOVE and shocked him for the first time. Because Elswick continued to resist, Deputy Derrough shocked him three more times on his elbow, forearm, and wrist while the others worked to subdue him. Once Elswick calmed down, Deputy Noce directed him to face the wall again. But Elswick reversed course and fought him off. So Deputy Derrough intervened and shocked him for a fifth time. Elswick continued to resist.

Deputy Derrough, Officer Puszert, and the other three deputies then moved Elswick into a temporary holding cell. There, Deputy Derrough deactivated the GLOVE while everyone attempted to deescalate the situation. But Elswick could not be persuaded—he said he did not care if he died and asked the officers to "just kill [him]" already. R. 55-9, PageID 703. Deputy Derrough cannot recall if he reactivated the GLOVE during the continued struggle.

After making no progress to remove the restraints, everyone left Elswick alone in the room. They left him there for about 45 minutes. Although there was a sink with a water fountain, Elswick thought the water was poisoned and chose to drink from the toilet. Because he was paranoid, fought off four people, and indicated a desire for self-harm, Deputy Derrough believed that Elswick required the use of a WRAP restraint device. So they placed Elswick in one, and the nurse checked to make sure it was not too tight. Deputy Derrough continued to check on Elswick until his shift ended, and he also asked the nurse to check on him again. At some point, the nurse brought Elswick a cup of water.

When Elswick was released, he went to the hospital. He told hospital staff that he had been electrocuted, but he does not recall if he complained of specific injuries. He does remember that his skin felt "weird" and "tender," as if he had been burned. R. 55-5, PageID 653.

Based on these events, Elswick sued Deputy Derrough in his individual capacity under 42 U.S.C. § 1983 for violations of his Fourteenth Amendment due-process rights, alleging that Deputy Derrough: (1) used excessive force, and (2) exhibited deliberate indifference to his needs for psychiatric intervention and potable water. Deputy Derrough sought summary judgment on all claims. The district court granted the motion. Elswick timely appealed.

**II.**

We review de novo a district court's order granting summary judgment based on qualified immunity. *Burnett v. Griffith*, 33 F.4th 907, 911 (6th Cir. 2022). "A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate clearly established constitutional rights of which a reasonable person would have known." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (citation modified).

**III.**

On appeal, Elswick challenges the district court's grant of summary judgment on his excessive-force claim and his two deliberate-indifference claims. We consider each claim in turn.

**A.**

Start with the excessive-force claim. Elswick argues that Deputy Derrough's use of the GLOVE violated his due-process rights. We disagree.

The Fourteenth Amendment's Due Process Clause protects pretrial detainees like Elswick from "objectively unreasonable" force. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). But when is force objectively unreasonable? We look to a nonexhaustive list of factors, including the need for force, alternative options, the detainee's resistance, the threat posed and the deputy's perspective of the threat's severity, and the detainee's injuries. *Id.* at 397.

The *Kingsley* factors favor Deputy Derrough. To book Elswick into the jail, the deputies had to remove his handcuffs and leg shackles. But Elswick resisted—the surveillance video shows him fighting off the deputies attempting to remove his restraints. Bear in mind that before the struggle, Deputy Derrough knew Elswick had tried to strike medical personnel and destroy their equipment, and he had tried to bite Officer Puszert. Because Elswick's hands were cuffed in front

of him, he had more range of motion to use the handcuffs offensively. Deputy Derrough believed that Elswick was a threat to himself and others, so he resorted to using the GLOVE, a single-setting device that emitted several low-voltage shocks. The shocks Elswick received were not enough to deter him. And although Elswick claims he suffered minor burn injuries from the use of the GLOVE, he presented no evidence that he needed medical treatment for any burns.

A deputy may use some force in response to a pretrial detainee's "active resistance" through "a deliberate act of defiance." *Cretacci v. Call*, 988 F.3d 860, 870 (6th Cir. 2021) (citation modified). Deputy Derrough did not use the GLOVE until after Elswick repeatedly refused to face the wall and remain still. Elswick has failed to show that Deputy Derrough's actions were objectively unreasonable.

Elswick resists this conclusion, arguing that the silent surveillance video does not show that he actively resisted. We reject this argument. The video, combined with witness testimony, confirms Elswick's defiant resistance. And on review of a summary-judgment decision, we "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Elswick also argues that the district court discounted the extent of his injuries. We acknowledge that Elswick complained of burns from Deputy Derrough's use of the GLOVE. Still, Elswick has failed to show that Deputy Derrough's actions were objectively unreasonable considering the *Kingsley* factors. Thus, Deputy Derrough was entitled to qualified immunity.

**B.**

We next consider Elswick's deliberate-indifference claims. A pretrial detainee is entitled to be free from conditions of confinement that "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To that end, a jail official's deliberate indifference to conditions that pose a

substantial risk to a pretrial detainee's health or safety violates the Due Process Clause. *Westmoreland v. Butler County*, 29 F.4th 721, 726–27 (6th Cir. 2022).

Deliberate-indifference claims can take many forms. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 926 (6th Cir. 2024). Elswick argues that he presented enough evidence to prove that Deputy Derrough was deliberately indifferent to his needs for psychiatric intervention and potable water. Both claims fail.

**1.**

Jail officials are required to ensure that pretrial detainees have access to adequate medical care. *Heeter*, 99 F.4th at 915. To survive summary judgment on his medical-care claim, Elswick had to show that: (1) his need for mental-health treatment was "objectively serious," and (2) Deputy Derrough's failure to provide it was deliberate and reckless "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis County*, 60 F.4th 305, 317 (6th Cir. 2023) (quotation omitted).

A medical need is "objectively serious" if it has been "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 311 (6th Cir. 2023) (quotation omitted). To show that Deputy Derrough recklessly ignored a serious medical need, Elswick must prove "more than negligence but less than subjective intent." *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021) (quotation omitted).

Assuming without deciding that Elswick could show an objectively serious need for medical attention, he cannot show that Deputy Derrough recklessly disregarded it. Deputy Derrough asked a jail nurse to evaluate Elswick twice. "A non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the

medical professionals' opinions." *Greene v. Crawford County*, 22 F.4th 593, 608 (6th Cir. 2022) (citation modified). Deputy Derrough deferred to the nurse to determine whether Elswick needed medical attention. Elswick has not shown that this deference was unreasonable. *See Mercer v. Athens County*, 72 F.4th 152, 163 (6th Cir. 2023). We therefore conclude that he has not presented enough evidence to show that Deputy Derrough was deliberately indifferent to his medical needs.

**2.**

Jail officials must provide pretrial detainees with "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This includes "drink[able] water." *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 512 (6th Cir. 2001).

Elswick argues that Deputy Derrough deprived him of potable water for over four hours. The record belies this argument. Elswick had access to safe water. Officer Puszert allowed him to bring a cup of water into the booking room and his temporary holding cell had a sink with a water fountain. Elswick chose not to drink the potable water. He cannot fault Deputy Derrough for that decision.

**IV.**

For these reasons, we **AFFIRM** the district court's judgment.