NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0451n.06

Case No. 22-3581

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

JOHN WHYDE, JR.,

    Plaintiff-Appellant,

v.

PAUL A SIGSWORTH, in his individual and official capacities as Sheriff of Erie County, Ohio; ERIE COUNTY, OHIO, through the Erie County Board of Commissioners, in their official capacities; ERIE COUNTY GENERAL HEALTH DISTRICT BOARD OF HEALTH, in its official capacity; WENDELL CRAIG ELDRIDGE, M.D., in his individual and official capacities; AMBER BURGESS, LPN, in her individual and official capacities, Erie County Health Department; HEATHER CROMWELL, RN, in her individual and official capacities, Erie County Health Department; JASON BEATTY and SCOTT J. HAMERNIK, in their individual and official capacities as Sergeants for Erie County Jail; KAINE KERR, JEANETTE BARRETT, JON SALYERS, and ROBERT PAYTOSH, Corrections Officers at Erie County Jail, in their individual capacities; THOMAS CASEY PROY, Lieutenant, in his individual and official capacities as Jail Administrator of Erie County Jail,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Nov 08, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

THAPAR, J., delivered the opinion of the court in which GIBBONS, J., joined. WHITE, J. (pp. 21–40), delivered a separate opinion concurring in the judgment in part and dissenting from it in part.

THAPAR, Circuit Judge. John Whyde arrived in jail dependent on opioids and Xanax. But instead of giving Whyde those drugs, jail staff prescribed an opioid-withdrawal protocol. After his condition worsened and Whyde became a threat to his own safety, corrections officers

forcibly restrained him.  Whyde argues those actions violated his rights.  The district court granted summary judgment to the defendants on the basis of qualified immunity, and we affirm.

I.

After John Whyde failed to appear for a court hearing, the Erie County Sherriff's Department arrested and booked him into the Erie County Jail on March 27, 2017.  At the time, Whyde had prescriptions for high doses of opioids and Xanax.  During booking, a corrections officer recorded Whyde's medical information on an Intake Screening Form.  The form asked whether Whyde had any "Current And/Or Past Mental Health Problems."  R. 117-1, Pg. ID 964.  In response, the officer wrote "Yes" and listed four drugs, including Xanax.  *Id.*  Additionally, where the form asked whether Whyde displayed any visible signs of withdrawal, the officer wrote that Whyde appeared to be withdrawing from opioids—but didn't mention Xanax.

The next day, Whyde met with Nurse Amber Burgess for a health appraisal.  Whyde says he told Nurse Burgess he had prescriptions for opioids and Xanax.  Although Burgess recorded that Whyde was taking opioids, she didn't mention Xanax on her Inmate Health Appraisal Form.  For her part, Burgess testified that Whyde never told her about his Xanax prescription.  Whyde also testified that he told Burgess he used four different pharmacies.  But Burgess only listed one pharmacy—the Fremont Wal-Mart—on the form.  She testified that this was the only pharmacy Whyde mentioned.  She contacted that pharmacy, which confirmed that Whyde had prescriptions for opioids—but not Xanax.  Whyde also says that, "[f]or unknown reasons," Burgess became "dismissive" toward Whyde after learning that he was the brother of one Billy Whyde.  Appellant's Br. 35.

Burgess then left a message for the jail's physician, Dr. Wendell Eldridge, informing him that Whyde had opioid prescriptions.  In response, Dr. Eldridge ordered that Whyde undergo an

opioid-detox protocol. Health District policy prohibited doctors from prescribing opioids to inmates, but Dr. Eldridge testified that he would have prescribed Whyde an opioid-detox protocol even if Whyde weren't in jail. That meant prescribing other medications to replace the opioids Whyde had been taking. Dr. Eldridge didn't prescribe a Xanax-withdrawal protocol because he didn't know Whyde had been taking that drug.

Before long, Whyde was hallucinating, lost his appetite, became paranoid and disoriented, and lost control of his bowels. Nurse Burgess noticed Whyde's deteriorating condition, but she also identified a simple explanation: he hadn't taken his withdrawal medications all day. Later that evening, with some assistance from jail staff, she administered his medications.

Whyde's condition only worsened. He continued to behave "in a bizarre and disoriented way." Appellant's Br. 45. Specifically, he was yelling and pounding on his cell door and window. Seeing this behavior, corrections officers worried that Whyde might hurt himself. So, for his own safety, they decided to remove him from his cell and place him in a restraint chair until his condition stabilized.

Jail video captures the next moments of the interaction. When officers came to restrain Whyde, he disobeyed their directions. After he refused officers' orders to present his hands to be cuffed, officers opened his cell door. Once the door was open, Officer Kaine Kerr twice ordered Whyde to turn around. Whyde twice refused, making an indiscernible remark to Officer Kerr in the process.

Events proceeded quickly after that. Officer Kerr entered the cell and took Whyde to the ground. Whyde continued to resist the officers' attempts to restrain him. Once the officers finally got control of Whyde, they placed him in a restraint chair. Whyde remained there for approximately seven hours. The sheriff's department then took him to the emergency room.

Whyde sued the County, the Health District, and various officials, alleging constitutional violations. *See* 42 U.S.C. § 1983. He also brought state-law tort claims against various defendants. The district court granted summary judgment to the defendants on all claims. Whyde now appeals three issues: his deliberate-indifference claims, his excessive-force claims, and his state-law claims for intentional infliction of emotional distress.

II.

We begin with Whyde's deliberate-indifference claims against Nurse Burgess, Dr. Eldridge, Lieutenant Proy, the Health District, and the County.

A.

Whyde alleges that Nurse Burgess, Dr. Eldridge, and Lieutenant Proy violated his Fourteenth Amendment right as a pretrial detainee to be free from deliberate indifference to his serious medical needs. Because the defendants invoke qualified immunity, Whyde must show the officials (1) violated a constitutional right (2) that was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). To satisfy the second prong, Whyde must identify a precedent putting reasonable officials on notice that their actions were unconstitutional "under the specific circumstances they encountered." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). And the case must have been binding on the officials at the time they committed the alleged misconduct. *Pearson*, 555 U.S. at 232; *Lawler v. Hardeman County*, 93 F.4th 919, 926 (6th Cir. 2024).

Whyde tries to overcome qualified immunity by relying on *Brawner v. Scott County*, which lowered the standard for deliberate-indifference claims by pretrial detainees like Whyde. *Helphenstine v. Lewis County*, 60 F.4th 305, 315–16 (6th Cir. 2023) (discussing *Brawner*, 14 F.4th 585 (6th Cir. 2021)). Before *Brawner*, a detainee had to show that an official "kn[ew] of and

disregard[ed] an excessive risk to inmate health or safety." *Id.* at 315 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). But after *Brawner*, a detainee need only show that an official acted with "something akin to reckless disregard"—a lower standard that doesn't require actual knowledge of a serious risk of harm. *Brawner*, 14 F.4th at 596 (citation omitted); *Lawler*, 93 F.4th at 928 (explaining that *Brawner* adopted a "more lenient test" than prior caselaw).

Whyde can't benefit from *Brawner*. Our court decided that case in September 2021—more than four years after Whyde's stay in the Erie County Jail. And to overcome qualified immunity, Whyde must show that officials violated law that was clearly established *at the time of the alleged misconduct*. *Lawler*, 93 F.4th at 926. *Brawner* didn't control in 2017; the Supreme Court's decision in *Farmer* did. *See id.* at 926–28. And under the *Farmer* standard, the officials here aren't liable unless Whyde can show they "kn[ew] of and disregard[ed]" an "excessive risk" to his health. *Farmer*, 511 U.S. at 837. The officials (a) must have known facts from which they could infer that Whyde was at a substantial risk of serious harm, *and* (b) must have actually drawn that inference for themselves. *Id.*

The dissent suggests that we should conduct the qualified immunity analysis under the *Brawner* standard because that's how the parties briefed the case. Dissenting Op. at 21–22. But regardless of what the parties think the law is, "courts have an independent obligation to get the law right." *United States v. Cabbage*, 91 F.4th 1228, 1231 (6th Cir. 2024); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (explaining that a court "retains the independent power to identify and apply the proper construction of governing law"). That means we must apply the correct governing law, even if the parties urge otherwise. And the correct law is clear: the qualified immunity analysis turns on precedent that applied at the time of the alleged

misconduct.  *Lawler*, 93 F.4th at 926.  Here, Whyde can't overcome the defendants' assertion of qualified immunity.

1.

Start with Nurse Burgess.  Whyde alleges she knowingly disregarded his risk of withdrawal when she failed to notify Dr. Eldridge about his Xanax prescription.  At the summary judgment stage, we draw all factual inferences in Whyde's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Even so, the record doesn't support that allegation.

To understand why, consider the three pieces of information that Nurse Burgess had about Whyde's Xanax use.  First, Whyde says he told her that he had a Xanax prescription.  For purposes of summary judgment, we accept as true Whyde's testimony that he told this to Nurse Burgess.  But a nurse doesn't know that an inmate is actually taking drugs just because he says so.  As we've explained before, when an inmate tells a nurse that he's in pain, that "might not be enough to infer that [the nurse] actually knew he was in pain—she could have thought, for example, that [the inmate] was misrepresenting his pain in order to get access to pain medications."  *Jackson v. Gibson*, 779 F. App'x 343, 348 (6th Cir. 2019).  This common-sense principle applies with even more force here.  An inmate might claim to have prescriptions for narcotic drugs in an effort to get those drugs from a nurse.  Thus, for Whyde to say "I'm taking Xanax" couldn't have given Nurse Burgess actual knowledge that he was, in fact, taking Xanax.

Second, Whyde's Intake Screening Form listed Xanax as one of Whyde's "Current And/Or Past" medications.  R. 117-1, Pg. ID 964.  A form stating that Whyde's Xanax use was either "[c]urrent" or "[p]ast" doesn't confer actual knowledge about when Whyde was taking Xanax. What's more, a separate question on the form asked about Whyde's *current* visible signs of withdrawal.  There, the response mentioned opioids—but not Xanax.  A form indicating that

Xanax was one of Whyde's "Current And/Or Past" medicines, but not one of the current medicines from which he was withdrawing, suggests that Xanax was a "[p]ast" medication that Whyde wasn't taking when he entered the jail. *See id.* So, even assuming that Nurse Burgess read this form (as Whyde alleges), it couldn't have led her to infer that Whyde was taking Xanax when he arrived in jail. On the contrary, the best reading of the form was that Whyde was *not* taking Xanax.

Finally, Xanax wasn't among the medications that Nurse Burgess verified with Whyde's pharmacy. Whyde says he told Burgess that he had used four different pharmacies. Burgess contacted one of those pharmacies—the Fremont Wal-Mart, which was the only pharmacy she listed on the Health Appraisal Form during her meeting with Whyde. That pharmacy verified that Whyde was taking opioids—but not Xanax.

Taking the facts in the light most favorable to Whyde, Nurse Burgess (1) heard from Whyde that he was taking Xanax; (2) read a form that listed Xanax as one of Whyde's "current and/or past" medicines, but not one of the drugs from which he currently seemed to be withdrawing; and (3) contacted one of the pharmacies Whyde mentioned, which confirmed only that he was taking opioids—not Xanax. Given this information, Nurse Burgess couldn't have had actual knowledge that Whyde was taking Xanax. And that means she couldn't have known he was at risk of Xanax withdrawal. No reasonable jury could conclude otherwise.

Regardless of whether Nurse Burgess should have done more to verify whether Whyde was taking Xanax, it's irrelevant to our legal analysis. "[E]rrors in medical judgment" or "negligent behavior" aren't enough for deliberate indifference under the *Farmer* standard. *Griffith v. Franklin County*, 975 F.3d 554, 568 (6th Cir. 2020) (citation omitted). The *Farmer* standard requires actual knowledge, which Nurse Burgess didn't have. On this record, no reasonable jury

could conclude that Nurse Burgess actually concluded for herself that Whyde was taking Xanax and was at risk of withdrawal. *See* 511 U.S. at 837.

Our conclusion that Nurse Burgess didn't know that Whyde was taking Xanax is enough to dispose of Whyde's first theory of deliberate indifference. But suppose, along with the dissent, that Whyde's alleged statement to Nurse Burgess *was* enough to give her actual knowledge that he was taking Xanax. Dissenting Op. at 25. Even so, Whyde still couldn't succeed on his deliberate-indifference claim.

Under *Farmer*, Nurse Burgess acted with deliberate indifference only if she "consciously disregard[ed]" Whyde's risk of Xanax withdrawal. *Farmer*, 511 U.S. at 839 (citation omitted). That means Whyde must identify evidence that Burgess subjectively knew that her actions would expose him to a risk of harm. *Id.* at 846 (explaining that an officer must "knowingly *and unreasonably disregard*" the risk (emphasis added)). Here, there are no facts in the record that could lead a jury to conclude that Burgess knowingly exposed Whyde to a risk of Xanax withdrawal. To be sure, Nurse Burgess didn't write down "Xanax" on the form she gave to Dr. Eldridge, which had the *effect* of exposing Whyde to a risk of withdrawal. But Whyde doesn't even argue—let alone point to evidence—that Burgess *knowingly* failed to write down Xanax. The most he says is that, "[f]or unknown reasons," Burgess changed her attitude and became "dismissive" toward Whyde after learning he was the brother of one Billy Whyde. Appellant's Br. 35. But Whyde doesn't assert that this "dismissive" attitude led Burgess to consciously refuse to record that he was taking Xanax. *See id.* Indeed, it would be difficult to make that assertion, considering that Burgess *did* inform Dr. Eldridge that Whyde was taking opioids after confirming that information with one of his pharmacies. Those aren't the actions of someone who knowingly decides to expose her patient to a risk of harm. And crucially, Whyde doesn't point to evidence

that would allow a jury to conclude otherwise. At most, therefore, Burgess's failure to write down Xanax would amount to negligence—which isn't enough for deliberate indifference under *Farmer*. *Griffith*, 975 F.3d at 568.

Our opinion in *Jackson v. Gibson* illustrates the point. 779 F. App'x 343. There, as here, we considered a nurse who took what we assumed were objectively unreasonable steps in addressing an inmate's known risk of harm. *Id.* at 348. But we refused to find deliberate indifference under *Farmer* because no facts showed that the nurse subjectively knew that she was exposing the inmate to a risk of harm. *Id.* In sum, even if Whyde could show that Nurse Burgess knew he was taxing Xanax and therefore faced a risk of withdrawal, he can't point to any facts that would allow a jury to conclude she consciously disregarded that risk.

Whyde offers another theory of Nurse Burgess's deliberate indifference: she allegedly failed to give him sufficient medical treatment after witnessing his withdrawal symptoms. But this theory also falls short. When Nurse Burgess met with Whyde, she observed that he was agitated, belligerent, and sweating. But she also noticed that he had refused to take his morning and afternoon medication. And Whyde's vital signs were consistent with his refusal to take the opioid-withdrawal medications that Dr. Eldridge had prescribed.

The undisputed facts show that Nurse Burgess reasonably responded to the medical needs Whyde presented: she had him take his prescribed medications. Treating him by administering that medication was a reasonable medical judgment that we are "reluctant to second guess." *See Griffith*, 975 F.3d at 568. The dissent faults us for failing to identify "evidence" that Whyde's medications—including "Neurontin, clonidine, Bentyl, hydroxyzine, and ibuprofen"—were adequate to treat his hallucinations. Dissenting Op. at 25–26. But the severity of the hallucinations, the degree to which the hallucinations should have been treated with drugs, and the

particular drugs used to treat them are all medical judgments best left to doctors, not judges. More importantly, the law does not require a nurse to second guess a doctor's prescribed medical treatment. And Dr. Eldridge's instructions weren't so obviously deficient that Nurse Burgess knew she would be placing Whyde at risk if she followed them. *See Farmer*, 511 U.S. at 837. Nurse Burgess thus did not exhibit deliberate indifference.

2.

Dr. Eldridge is also entitled to summary judgment on Whyde's deliberate-indifference claim. Whyde faults Eldridge for prescribing an opioid-detox program instead of opioids themselves. But judges aren't medical professionals, so it's not our job to second guess a practitioner's medical judgments. *Id*. Accordingly, a medical professional is deliberately indifferent in only two narrow contexts: where the professional's medical care was either (1) "so grossly incompetent" that it "shock[s] the conscience" or (2) "so cursory as to amount to no medical treatment at all." *Helphenstine*, 60 F.4th at 322 (citation omitted). Outside these two categories, an inmate's remedy lies in malpractice law, not the federal Constitution.

Dr. Eldridge's refusal to issue highly addictive prescription drugs to a patient with a dependency doesn't fall into either category. "Efforts to wean a prisoner off opiate or narcotic pain medication to which he has become addicted" do not qualify as deliberate indifference. *Baker v. Stevenson*, 605 F. App'x 514, 519 (6th Cir. 2015) (declining to find deliberate indifference under the Eighth Amendment). Rather, they reflect "a medical judgment that the long-term harms of addiction and abuse outweigh the short-term benefits of reduced subjective pain." *Id.*; *see also Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (holding that physician's decision to treat opioid withdrawal with non-opioid medications was a reasonable medical judgment that did not violate Eighth Amendment); *Rascón v. Douglas*, 718 F. App'x 587, 591

(10th Cir. 2017) (same). And here, as Dr. Eldridge testified, the opioid-withdrawal protocol was a reasoned medical response to Whyde's opioid-withdrawal symptoms.[1] For a deliberate-indifference claim, it's the doctor's judgment that counts—not the patient's desires. The Constitution gives inmates a right to be free from deliberate indifference to their medical needs, but not a right to receive any particular treatment or desired medication.

Whyde argues otherwise, relying on *Boretti v. Wiscomb*, 930 F.2d 1150 (6th Cir. 1991), and *Richmond v. Huq*, 872 F.3d 355 (6th Cir. 2017), *amended and superseded*, 885 F.3d 928 (6th Cir. 2018). Those cases can't help him. Both involved allegations that medical professionals deliberately provided *no* treatment in the face of a known medical issue. *See Boretti*, 930 F.3d at 1152, 1154 (holding that an inmate had a potential deliberate-indifference claim when nurse refused to treat defendant's wound because she "did not have time for him and could not be bothered with his petty excuses"); *Richmond*, 885 F.3d at 942–43 (finding a potential claim when doctors allegedly failed to give any medication to psychiatric patient). The same is true of *Murray v. Department of Corrections*, 29 F.4th 779 (6th Cir. 2022), which the dissent invokes. Dissenting Op. at 28–29; *Murray*, 29 F.4th at 783, 787 (finding potential claim where doctor failed to monitor a patient's blood-thinning level, even though previous doctors had already determined that such monitoring was medically necessary, and even though the doctor himself noted that such a test "was overdue"). But here, Dr. Eldridge *did* treat Whyde's opioid withdrawal: he prescribed a program of opioid-withdrawal medications designed to remedy that exact issue. Far from ignoring

---

[1] The dissent charges us with failing to identify evidence "that any medical staff examined Whyde to determine his need for opioid medications" to treat his underlying pain. Dissenting Op. at 30. But that misapprehends the nature of Whyde's claim. Whyde isn't claiming that the injuries giving rise to this lawsuit resulted from the underlying pain for which he was originally prescribed opioids. Rather, Whyde claims he was injured by *withdrawal* from those opioids. And Dr. Eldridge testified that, in his medical judgment, the detox protocol was an appropriate response to Whyde's withdrawal.

Whyde's acknowledged need for withdrawal treatment, Dr. Eldridge provided Whyde with that treatment. He is thus entitled to summary judgment.

A final note on Dr. Eldridge. Because we hold on the merits that his conduct didn't violate the Constitution, we have no occasion to consider whether Dr. Eldridge violated rights that were "clearly established." *See Pearson*, 555 U.S. at 232. But the dissent would reverse his award of summary judgment. Dissenting Op. at 27. That would require holding that Dr. Eldridge's conduct (if proven at trial) not only violated the Constitution, but also violated constitutional law that was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. But neither Whyde nor the dissent identifies a case that would have put Dr. Eldridge on notice that his specific conduct was unlawful.

The dissent rests on *Murray*. *See* Dissenting Op. at 28–29. But that case is irrelevant to the qualified immunity analysis: it couldn't have been "clearly established" at the time the alleged misconduct occurred (in 2017) because it was decided years later (in 2022). *Lawler*, 93 F.4th at 926. Additionally, *Murray*'s facts are, at the very least, different from these ones—enough that applying *Murray* here would mean extending it. And we can't do that in the qualified immunity context. As we explained above, the doctor in *Murray* failed to perform blood tests that all agreed were medically necessary, even though the same doctor noted that such a test "was overdue." *Murray*, 29 F.4th at 783, 787. Dr. Eldridge did nothing like that. Instead, he prescribed treatment that he deemed to be medically appropriate.

3.

Whyde next appeals the grant of summary judgment on his deliberate-indifference claim against Lieutenant Proy. But Whyde never responded to that part of the County Defendants'

motion for summary judgment below. So he's forfeited that claim. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023).

B.

Whyde also appeals the grant of summary judgment to two municipal entities—Erie County and its General Health District Board of Health—on his deliberate-indifference claims. Under section 1983, municipal entities aren't liable for the acts of their employees or agents. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, Whyde must show that the entity had a "policy" or "custom" with a "direct causal link" to the individual defendants' misconduct. *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010).

1.

Start with the Health District. Its policy "prohibit[ed] any inmate of the Erie County Jail from receiving any opioid prescription medication" or "any benzodiazepine prescription medication" while at the facility. R. 137-6, Pg. ID 2866. The parties disagree about what that policy means. According to Whyde, it means that inmates couldn't receive opioids or benzodiazepines in jail. According to the Health District, the policy prohibits inmates from continuing to receive drugs that were prescribed before they arrived in jail, but nevertheless allows an inmate to receive those same drugs "in weaning doses" as part of a "withdrawal protocol." Health Appellee's Br. at 26 (quoting R. 193, Pg. ID 4592). Viewing this dispute in the light most favorable to Whyde, we assume that the policy prohibited him from receiving opioids or benzodiazepines, period.

Even so, Whyde can't succeed on his claim. As we've already explained, refusing to distribute highly addictive substances to inmates with dependencies doesn't amount to deliberate indifference. Accordingly, the Health District's policy directing doctors to withhold those

substances also passes muster. To be sure, a blanket no-narcotics policy might need to give way when a physician makes an "individualized determination[]" that a patient's medical condition demands treatment with narcotics.[2] *French*, 376 F. App'x at 523. But here, we don't need to ask whether the Health District's policy would have allowed Dr. Eldridge to prescribe Whyde opioids if Dr. Eldridge deemed it necessary. That's because Eldridge *didn't* deem it necessary. Instead, he concluded that the opioid-withdrawal protocol would adequately address Whyde's opioid-withdrawal symptoms. Indeed, contrary to the dissent's claim that Dr. Eldridge's decision was based on the no-opioids policy, Dr. Eldridge specifically testified that he would have prescribed this same course of treatment even if Whyde weren't in jail. R. 117, Pg. ID 946; *see* Dissenting Op. at 30. In sum, the Health District's policy is constitutional because it did not cause Whyde to receive medical care that "shocks the conscience" or "amount[s] to no treatment at all." *Helphenstine*, 60 F.4th at 322.

In concluding otherwise, the dissent relies on *Brawner*, 14 F.4th at 598–99. But the dissent's discussion of that case glosses over a crucial distinction with this one. In *Brawner*, a nurse ordered the "abrupt discontinuation" of three prescribed medicines pursuant to her county's no-narcotics policy. *Id.* The nurse ordered the discontinuation of these medications even though the inmate's treating physician testified that it was "inhumane" to discontinue them. *Id.* at 598. Crucially, the nurse failed to provide "suitable substitutes" for the discontinued medications. *Id.*

---

[2] Of course, jails and prisons are always free to ban narcotics and other addictive substances from entering their walls. We must "defer[] to policies and practices" that, "in the judgment of jail officials," are necessary to "preserve internal order and discipline and to maintain institutional security." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). And it's easy to see why banning drugs from a jail is necessary to maintain discipline and security. *See id.*; *see also French v. Daviess County*, 376 F. App'x 519, 522 (6th Cir. 2010) ("Where the question is one of administering a highly addictive drug on a continuing basis in the prison setting, the prison staff should have some discretion."). Indeed, jails and prisons may ban such drugs even where they are necessary for adequate medical treatment, so long as the necessary drugs could be successfully administered elsewhere. For example, instead of bringing drugs into the building, a jail or prison could transfer the inmate to an outside medical facility and administer the drugs there.

Indeed, *Brawner* expressly rested on the fact that the inmate "was never prescribed the medications she had previously been taking *or provided with an alternative treatment plan.*" *Id* at 599. (emphasis added). Here, by contrast, Whyde was "provided with an alternative treatment plan." *See id.* Instead of abruptly discontinuing Whyde's medications, Dr. Eldridge *replaced* them with a withdrawal program. What's more, far from concluding that the withdrawal program would be "inhumane," Dr. Eldridge thought it would best serve Whyde's medical interests. *See id.* at 598. This "suitable substitute" for Whyde's narcotic medications makes our case unlike *Brawner*. *Id.*

2.

Whyde briefly argues that Erie County is liable for the Health District's policy. But the challenged policy was the Health District's, not the County's. A County and its officials do not act with deliberate indifference where, as here, they reasonably defer to a medical professional's treatment decisions. *Grote v. Kenton County*, 85 F.4th 397, 412 (6th Cir. 2023). And in any event, the policies aren't unconstitutional, as explained above. So the County is entitled to summary judgment on this claim.

III.

We now turn to Whyde's excessive-force claims, which he appeals as to Kerr, Salyers, Hamernik, Barret, Paytosh, and Erie County. Pretrial detainees have a constitutional right against the use of excessive force. *Kingsley*, 576 U.S. at 397. Force is excessive when it is "objectively unreasonable" under all the facts and circumstances. *Id.*

A.

The individual defendants assert qualified immunity. To overcome this defense, Whyde must show that the defendants' actions infringed upon "clearly established" statutory or constitutional rights of which a reasonable person would have known. *Rivas-Villegas v.*

*Cortesluna*, 142 S. Ct. 4, 7 (2021). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate," although the plaintiff does not necessarily need to show "a case directly on point." *Id.* at 7–8 (citation omitted). Because excessive-force claims turn on the facts and circumstances of each case, "[s]pecificity is especially important" in this context. *Id* at 8 (citation omitted). Ultimately, Whyde has not identified any case specific enough to have placed the alleged conduct beyond constitutional debate.

1.

Whyde alleges Officer Kerr used excessive force when he took Whyde to the ground. But Whyde can't point to a case showing that Officer Kerr's force was excessive. To the contrary, our caselaw suggests that Kerr acted reasonably. "If a suspect actively resists arrest and refuses to be handcuffed," officers do not violate the Constitution even when they use tasers, batons, or pepper spray to subdue him. *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). And active resistance can take the form of "verbal hostility" or a "deliberate act of defiance." *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). It can also take the form of an individual's refusing to move his hands for police to handcuff him, at least when "coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015).

Here, Whyde actively resisted the officers' orders. He refused to put his hands through the chute so that officers could handcuff him. He also refused to comply with both of Officer Kerr's instructions to "turn around." Instead, he faced forward and said something indiscernible to Kerr. In sum, Whyde "refus[ed] to move [his] hands for the police to handcuff [him]," and that refusal was "coupled with other acts of defiance," like refusing to turn around and engaging in verbal hostility. *Rudlaff*, 791 F.3d at 641; *Goodwin*, 781 F.3d at 323. That means his conduct amounted to active resistance. *Id.*

In light of Whyde's active resistance, Officer Kerr was entitled to take Whyde to the ground. This use of force is comparable to others that we've held reasonable. *See Cretacci v. Call*, 988 F.3d 860, 869 (6th Cir. 2021) (holding that it was reasonable for officer to shoot inmate with a pepperball launcher when the inmate refused to obey an order to get on the ground); *Bozung v. Rawson*, 439 F. App'x 513, 519–20 (6th Cir. 2011) (holding that it was reasonable for officer to employ a straight-arm bar takedown during the execution of an arrest warrant, even where the arrestee was cooperative and where no evidence suggested he was armed or posed a threat); *Earnest v. Genessee County*, 841 F. App'x 957, 960 (6th Cir. 2021) (holding that a takedown was reasonable where suspect "resisted arrest and refused to put his hands behind his back despite repeated instructions to do so"). Our caselaw thus indicates that Kerr's use of force was reasonable. At a minimum, Officer Kerr is entitled to qualified immunity, since it was far from clearly established that his use of force was excessive.

The fact that this episode took place inside a jail only strengthens our conclusion. Our reasonableness determination "must . . . account for the [government's] legitimate interests" in managing a jail. *Kingsley*, 576 U.S. at 397. We must "defer[] to policies and practices" that, "in the judgment of jail officials," are necessary to "preserve internal order and discipline and to maintain institutional security." *Id.* Kerr's need to ensure order and security in the jail authorized him to use a takedown maneuver on an uncooperative inmate who refused to be handcuffed.

Whyde's cited cases are not to the contrary. As an initial matter, to meet his burden of defeating qualified immunity, Whyde must point to "existing precedent" that has "placed the statutory or constitutional question beyond debate." *Bell*, 37 F.4th at 367 (quoting *Rivas-Villegas*, 142 S. Ct. at 8 (emphasis added)). That eliminates most of Whyde's cases, which either don't have precedential effect or were decided years after Kerr's conduct.

The remaining case Whyde cites is nothing like the facts before us. In *Coley v. Lucas*, a detainee had already been restrained with handcuffs, a belly chain, and leg irons. 799 F.3d 530, 539 (6th Cir. 2015). Without any provocation, an officer pushed that restrained detainee face-first into a wall. *Id.* We held that the officer's use of force was excessive. *Id.* But here, Whyde wasn't restrained and was actively resisting. So *Coley* is inapposite.

The dissent suggests that Kerr's force was unreasonable because there was a "tenuous" link between the need for force and the amount of force that Kerr used. Dissenting Op. at 36. But we can't strictly scrutinize the officer's decisions by asking, with the benefit of hindsight, whether a lesser amount of force might have theoretically done the job. Instead, Whyde needs a case holding that Kerr's "specific conduct" was unlawful. *See id.*; *Rivas-Villegas*, 142 S. Ct. at 8. But neither he nor the dissent points to one. The dissent further argues that Kerr's force was unreasonable because Whyde was "calm." Dissenting Op. at 36. But Whyde openly defied the officers' orders after yelling and banging on his cell, and Whyde himself acknowledges that he was behaving "in a bizarre and disoriented way." Appellants' Br. 45. Under these circumstances, Kerr's use of a takedown maneuver was reasonable. No clearly established law holds otherwise.

2.

Whyde also sues Kerr, Salyers, Hamernik, Barrett, and Paytosh for allegedly using excessive force against him after he was taken to the ground. He says that Kerr punched him, Salyers stepped on his leg, Hamernik made the decision to place him in a restraint chair, Barrett held his jaw, and Paytosh manhandled him. But Whyde himself admits that he physically resisted the officers' efforts to subdue him. Appellant's Br. 18 (conceding that Whyde was "actively resisting"; *id.* at 16 (explaining that Whyde "resisted" the officers and "struggled with" them). And Whyde doesn't cite a binding case holding that the officers' use of force after the takedown

was unreasonable in the face of his resistance. Additionally, Whyde faults the officers for leaving him in the restraint chair for over six hours. But Whyde hasn't developed a legal argument for how this violated clearly established law. The officers are entitled to qualified immunity, and we therefore affirm the grant of summary judgment to the officers on this claim.

B.

Whyde also brings *Monell* claims against Erie County and Sheriff Sigsworth in his official capacity. First, he says that the sheriff's office ratified the officers' use of force when Sigsworth testified, in a deposition, that he believed the use of force was appropriate.[3] *See Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). Relying on *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), and *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), Whyde suggests that the Sheriff's after-the-fact approval of the officers' conduct is evidence of a custom or policy of approving excessive force. Appellant's Br. 27–28. "Since *Leach* and *Marchese*, however, we have clarified the scope of this 'ratification' theory in a way that dooms [Whyde's] claim." *Pineda*, 977 F.3d at 495. In *Pineda*, we explained that a single after-the-fact ratification isn't enough to establish *Monell* liability. *Id.* Instead, to overcome section 1983's causation hurdle, a plaintiff must demonstrate "a clear and persistent pattern" of earlier, comparable violations that the defendant approved of or failed to investigate. *Id.* For example, in *Leach*, "there was a record of approximately 14 other instances of similar abuse in a two-year period" before the abuse that the sheriff allegedly ratified. *Id.* (citing *Leach*, 891 F.2d at 1247). Here, Whyde hasn't pointed to any previous approvals of, or failures to investigate, excessive force. So his claim against the sheriff's office fails. *See id.*

---

[3] "We assume for this case that the sheriff's office qualifies as a distinct 'legal entity' apart from [Erie] County because the defendants have not challenged" Whyde's naming of this office. *Pineda v. Hamilton County*, 977 F.3d 483, 494 (6th Cir. 2020).

- 19 -

Second, Whyde faults the County for not investigating the officers' actions against him. But as just explained, a single failure to investigate can't give rise to liability under section 1983, which requires, at minimum, "[a] series of investigative failures before the plaintiff's injury." *Id.* Whyde hasn't alleged that the County consistently refused to investigate allegedly unconstitutional uses of force before Whyde's stay in jail. Thus, the district court properly granted summary judgment to the County and sheriff's office on Whyde's *Monell* claims.

IV.

Finally, Whyde appeals the grant of summary judgment to the defendants on his state-law claims for intentional infliction of emotional distress. Under Ohio law, the officials enjoy immunity for actions taken in good faith within the scope of their employment. Ohio Rev. Code. Ann. § 2744.03(A). Because the state and federal immunities turn on the same facts, we review the Ohio immunity defense "through the lens of the federal qualified immunity analysis." *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (citation omitted). Indeed, the Ohio statutory-immunity defense "stands or falls with the federal qualified immunity defense." *Id.* (cleaned up). We have already concluded that the officials are entitled to qualified immunity on Whyde's federal claims. Accordingly, they are also entitled to Ohio statutory immunity from Whyde's state-law claims for intentional infliction of emotional distress. *Id.* The district court correctly granted summary judgment on these claims.

\* \* \*

We affirm.

**HELENE N. WHITE, Circuit Judge, concurring in the judgment in part and dissenting in part.**

Although I agree that summary judgment was appropriate on most of John Whyde, Jr.'s claims, I would reverse the grant of summary judgment on certain deliberate-indifference claims against Amber Burgess (the jail nurse), Wendell Craig Eldridge (the jail doctor), and the Erie County General Health District (their employer), as well as the excessive-force claim against Kaine Kerr (a jail officer). Additionally, I would vacate the grant of summary judgment on the state-law claims against Burgess, Eldridge, and Kerr.

## I.

The majority first concludes that Whyde cannot rely on this court's decision in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021), and its progeny. *See* Maj. Op. at 5–6. Before *Brawner*, we analyzed claims by prisoners and pretrial detainees similarly, asking whether the plaintiff "had an 'objectively' serious medical need" that a government official disregarded with a mental state "akin to criminal-law recklessness." *Howell ex rel. Howell v. NaphCare, Inc.*, 67 F.4th 302, 311 (6th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). *Brawner* held that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), abrogated earlier circuit precedent requiring the same mental state for prisoners' and pretrial detainees' claims and further held that civil-law recklessness governs pretrial detainees' claims. *See* 14 F.4th at 596–97. Because *Brawner* was decided after the conduct at issue here, however, the majority says that *Brawner* could not have been clearly established law for qualified-immunity purposes and cites our recent decision in *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919 (6th Cir. 2024), in support. *See* Maj. Op. at 5–6.

None of the defendants raises this timeline issue. They do not argue in their briefs that *Brawner* cannot apply to the qualified-immunity inquiry. To the contrary, they extensively discuss

*Brawner* and argue only that the facts of this case fail to meet the recklessness standard it adopted. Further, after this court decided *Brawner*, defendants appear to have litigated the case before the district court based on that decision. And the district court analyzed Whyde's claims under the post-*Brawner* standard.[1] Further, defendants did not bring *Lawler* to our attention in a letter under Federal Rule of Appellate Procedure 28(j). Indeed, the first time *Lawler*, or the timeline issue more generally, entered this case was at oral argument, at the prompting of the court. *Cf. Waterhouse v. Tennessee Valley Auth.*, No. 20-5978, 2021 WL 1230371, at *2 (6th Cir. Mar. 17, 2021) ("Because both parties argued in favor of applying state law and we have previously applied state law to tort actions against TVA, the district court did not err by applying Tennessee law." (citation omitted)).

I also note that *Lawler*'s conclusion regarding *Brawner*'s applicability to the clearly-established-law inquiry for conduct predating *Brawner* does not affect the inquiry in Whyde's excessive-force claim against Kerr because *Kingsley* held before the conduct at issue here that the objective-reasonableness standard governs such claims by pretrial detainees.

## II.

Even assessing clearly established law from a pre-*Brawner* standpoint, reversal of the grant of summary judgment on the deliberate-indifference claim against Burgess is warranted.

Criminal-law recklessness requires "that the official was aware of facts from which an inference of substantial risk of serious harm . . . could be drawn and . . . actually drew the inference." *Brawner*, 14 F.4th at 591. That is, the official must be consciously aware of, then

---

[1] I note that, before *Lawler*, this court often applied *Brawner* and related cases in qualified-immunity contexts even when the conduct at issue predated *Brawner*. *See, e.g.*, *Greene v. Crawford Cnty.*, 22 F.4th 593, 603–04, 606–07, 614–15 (6th Cir. 2022); *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 311, 316–17, 326–27 (6th Cir. 2023); *Howell*, 67 F.4th at 308, 311–12, 317–18; *Mercer ex rel. Ohlinger v. Athens Cnty.*, 72 F.4th 152, 156–57, 160–61, 164 (6th Cir. 2023).

disregard, the risk. Civil-law recklessness requires that the official disregarded a risk "that is either known or so obvious that it should be known." *Id.* at 594 (quoting *Farmer*, 511 U.S. at 836–37). The difference between those two standards is whether the official subjectively knew the risk versus whether the risk was sufficiently obvious.

Here, a jury could reasonably conclude that Burgess consciously disregarded the risk posed by Xanax cessation. Whyde's intake screening form listed Xanax. And Burgess, who performed Whyde's health appraisal, testified that she routinely reviews such forms during appraisals. *See United States v. Ware*, 282 F.3d 902, 906–07 (6th Cir. 2002) (noting that a jury can infer from evidence of routine or standard process that an event occurred on a given occasion); *Brawner*, 14 F.4th at 592 n.1, 597 (noting routine practice concerning intake forms listing a detainee's medications). More to the point, Whyde testified that he told Burgess about his Xanax prescription during the appraisal. And the risks of Xanax withdrawal, or at least the need to inform Eldridge of Whyde's Xanax use, should have been clear to a reasonable person in Burgess's shoes, especially given her medical background. *See Brawner*, 14 F.4th at 597–98 (noting the nurse's specialized training and experience); *French v. Daviess Cnty.*, 376 F. App'x 519, 522 (6th Cir. 2010) ("Xanax is a highly addictive medication, which can cause serious withdrawal symptoms like seizures and delirium if discontinued abruptly.").

Burgess's failure to address Whyde's worsening medical state during his detention further supports that a jury reasonably could conclude that she consciously disregarded the risk to Whyde. A few days after his appraisal, while in the shower room, Whyde told a corrections officer that he was hallucinating, and the officer called Burgess to meet them at Whyde's cell. Whyde told Burgess that he felt "sick" and was "seeing stuff." R. 110, PID 583. And during medication rounds later that evening, Whyde told Burgess that he thought she was trying to poison him.

The majority minimizes these facts in asserting that Whyde points to nothing showing "that Burgess *knowingly* failed to write down Xanax" during her appraisal of Whyde. Maj. Op. at 8. It therefore contends that, "[a]t most, … Burgess's failure to write down Xanax would amount to negligence—which isn't enough for deliberate indifference under Farmer." *Id.* at 9. But Burgess testified that she knew the jail had a standard procedure to manage withdrawal from substances like Xanax and that it is important for detainees to receive proper treatment based on their conditions and medications. It is also common knowledge even among laypersons, and especially among medical providers, that Xanax is a dependence-inducing drug. And a reasonable jury could certainly infer that Burgess knew the risk of Xanax cessation. As *Farmer* put it: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." 511 U.S. at 842.

The majority makes much of the Xanax notation on Whyde's intake form appearing in the field labeled "current and/or past" mental-health issues, reasoning that "[a] form stating that Whyde's Xanax use was either '[c]urrent' or '[p]ast' doesn't confer actual knowledge about when Whyde was taking Xanax." Maj. Op. at 6 (second and third alterations in original). And it points out that, when Burgess contacted the Fremont Wal-Mart—one of the four pharmacies Whyde told Burgess he used, the Fremont Wal-Mart verified only that Whyde was taking opioids. *Id*. at 7.

This reasoning fails to view the evidence in the light most favorable to Whyde. A jury could reasonably reach the majority's conclusion that Burgess was unaware that Whyde was taking Xanax at the time of his booking—but it also could reasonably conclude otherwise. And, given the temporal ambiguity of Whyde's statement that he used four pharmacies, a jury could

reasonably conclude that the Fremont Wal-Mart's confirming only the opioid prescription does not compel a different conclusion. Indeed, the majority's reasoning is tantamount to saying that if a jury were to conclude based on this evidence that, more likely than not, Burgess knew Whyde was taking Xanax, the jury would have found facts *un*reasonably, and the majority would overrule their conclusion. And lest we forget, Whyde also told Burgess he was taking Xanax.[2]

The majority then says that "[t]he undisputed facts show that Nurse Burgess reasonably responded to the medical needs Whyde presented" later in his detention by offering him the medications that Eldridge prescribed, and that his medical condition and vital signs "were consistent with his refusal to take the opioid-withdrawal medications." Maj Op. at 10.

But even if Burgess thought that Whyde's symptoms were consistent with opioid withdrawal, a jury could conclude that Burgess did not respond reasonably based on Whyde's telling Burgess that he was hallucinating and thought she was trying to poison him. *See Helphenstine*, 60 F.4th at 322–23 (ruling that a jury could conclude that a doctor was deliberately indifferent in failing to order hospitalization for a detainee in drug or alcohol withdrawal with vomiting, incontinence, and dehydration and instead ordering two prescriptions); *Greene*, 22 F.4th at 608–09 (ruling that a jury could conclude that officers unreasonably relied on crisis-services worker's determination that a detainee suffering from severe alcohol withdrawal did not need further medical treatment in part because detainee "had not slept in over 24 hours . . . and continued to suffer from severe hallucinations after [the] evaluation"). It does not appear that any of Whyde's prescribed medications—consisting primarily of Neurontin, clonidine, Bentyl,

---

[2] The majority also notes that "a separate question on the form asked about Whyde's *current* visible signs of withdrawal. There, the response mentioned opioids—but not Xanax." Maj. Op. at 6. This point is a red herring. It does not negate the fact that another field on the intake form included Xanax. Moreover, the booking officer who completed Whyde's form recorded Whyde's state as he entered the jail, so it would be unsurprising if Whyde either did not yet show current visible signs of withdrawal from Xanax or showed only signs of Xanax withdrawal indistinguishable to a nonmedical official's eye from the signs of opioid withdrawal.

hydroxyzine, and ibuprofen—could have treated hallucinations adequately or, in fact, at all. The majority points to no evidence, and I am aware of none, indicating as much.[3] Further, hallucinations are obviously severe withdrawal symptoms—so severe that they often necessitate hospitalization. But upon hearing Whyde's report of hallucinations, Burgess did not contact Eldridge or make other arrangements for further diagnosis or treatment. Whyde's symptoms ultimately deteriorated to the point that a mental-health professional recommended that he be hospitalized. Once admitted, he was diagnosed with acute psychotic disorder due to acute polysubstance withdrawal and delirium.

The majority responds that "the law does not require a nurse to second guess a doctor's prescribed medical treatment." Maj. Op. at 10. But Burgess was not entitled to blindly rely on Eldridge's instructions, either. *See Howell*, 67 F.4th at 315 ("[A non-medically trained officer's] deference [to a medical professional's opinion], however, may not be absolute or indefinite[.]"); *Stojcevski v. Macomb Cnty.*, 827 F. App'x 515, 522 (6th Cir. 2020) ("[A]n officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical opinion for a reasonable period of time after it is issued, *absent circumstances such as the onset of new and alarming symptoms*." (cleaned up and emphasis added)). And *Jackson v. Gibson*, which the majority cites in support of this point, is inapposite. 779 F. App'x 343 (6th Cir. 2019). In *Jackson*,

---

[3] Neurontin, the brand name of gabapentin, is a nerve medication often used to treat epilepsy. *Gabapentin*, Cleveland Clinic, https://perma.cc/4LN9-55EX; Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) (discussing when and how it is appropriate for courts to take notice of "medical information … gleaned from the websites of highly reputable medical centers"). Clonidine is an antihypertensive drug that treats elevated blood pressure and heart rate. *Clonidine Tablets*, Cleveland Clinic, https://perma.cc/42G6-WKXY. Bentyl, the brand name of dicyclomine, is an antispasmodic medication that treats gastrointestinal distress. *Dicyclomine Capsules or Tablets*, Cleveland Clinic, https://perma.cc/KQQ2-BPZZ. Hydroxyzine is an antihistamine that treats anxiety. *Hydroxyzine Solution*, Cleveland Clinic, https://perma.cc/X4XV-JWA5. And ibuprofen is typically an over-the-counter drug used to treat mild to moderate pain and inflammation. *Ibuprofen Capsules or Tablets*, Cleveland Clinic, https://perma.cc/R8ZN-RVTY.

the defendant nurse testified that she referred the plaintiff for an appointment with a physician after she examined his foot injury. *Id.* at 347. Not so here. *Jackson* therefore does not support granting Burgess summary judgment.

## III.

I would also reverse the grant of summary judgment to Eldridge on the deliberate-indifference claim based on the discontinuation of Whyde's pain medications. A jury could reasonably conclude that Eldridge consciously disregarded Whyde's chronic pain by failing to treat him adequately.

Of course, as the majority accurately observes, there is a distinction "between cases where the [detainee asserts] a complete denial of medical care and those cases where the claim is that [the detainee] received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "[C]ourts are generally reluctant to second guess medical judgments," *id.*, and, "[a]s a general rule, a patient's disagreement with [a] physician[] over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983," *Darrah v. Krishner*, 865 F.3d 361, 372 (6th Cir. 2017).

"Medical officials, however, 'may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment'" and calling it a day. *Howell*, 67 F.4th at 313 (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010)). "[G]rossly inadequate medical care" amounts to a constitutional violation. *Helphenstine*, 60 F.4th at 322 (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). Thus, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference," *id.* (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)), as can "a decision to

provide an 'easier and less efficacious treatment,'" *Darrah*, 865 F.3d at 372 (quoting *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 552 (6th Cir. 2014)).

The evidence here is adequate to meet that standard. Eldridge knew that Whyde had prescriptions from his outside physicians for high dosages of pain medications, supporting an inference that Eldridge further knew that Whyde had a serious pain condition for which the physicians believed the medications were necessary. Eldridge nonetheless ordered cessation of these medications and substituted ibuprofen in their place. He did nothing to verify whether Whyde in fact needed these medications to treat his pain, such as examining him, arranging for a nurse to examine him, or contacting his treating physician. Apparently, it did not matter whether "those medications were necessary to treat [Whyde's] pain" because, Eldridge testified, "[t]here[] [was] a policy that there were no opioids in the jail." R. 117, PID 947. Eldridge also testified that even if a detainee like Whyde were "in a significant amount of pain," in jail, "he would just have to suffer." *Id.* at 946. Nor did Eldridge arrange for Whyde to go to a hospital where he could receive adequate treatment.

We have held that interrupting or failing "to adhere to a prescribed course of treatment may satisfy the subjective component of" a deliberate-indifference claim. *Richmond v. Huq*, 885 F.3d 928, 939 (6th Cir. 2018), *abrogated on other grounds by Brawner*, 14 F.4th at 591–97. In *Murray v. Department of Corrections*, for example, this court affirmed the denial of a prison physician's motion for summary judgment on qualified immunity grounds because the physician "failed to adhere to [a prisoner's] treatment plan that was established by" an outside medical team for the prisoner's deep-vein thrombosis. 29 F.4th 779, 789 (6th Cir. 2022). The physician "understood the importance of monitoring" the prisoner's blood-thinning level given the nature of his condition and anticoagulation medications. *Id.* The physician also "was aware of the [outside medical]

team's established plan of care" and knew that the prisoner's level "was not being tested with regularity." *Id.* The physician thus was aware of, yet disregarded, the risks to the prisoner—who ultimately suffered pain and other symptoms before a stroke left him permanently blind, *see id.* at 784—and a jury could find the physician deliberately indifferent, *see id.* at 789. The same is true here—that Eldridge knew an outside physician prescribed high dosages of opioid pain medications supports an inference that he knew the risk of severe pain posed by cessation. True, as the majority points out, *see* Maj. Op. at 11, the physician in *Murray* deviated from the prescribed course of treatment by not doing any blood tests at all, rather than by conducting an alternative test. But the point remains the same: failing to follow Whyde's prescribed course of treatment is enough to satisfy the subjective component of a deliberate-indifference claim against Eldridge, making summary judgment in Eldridge's favor inappropriate.

In reasoning to the contrary, the majority seizes on a statement from *Baker v. Stevenson*, an unpublished decision, that "[e]fforts to wean a prisoner off opiate or narcotic pain medication to which he has become addicted are not an unconstitutional form of punishment but a medical judgment that the long-term harms of addiction and abuse outweigh the short-term benefits of reduced subjective pain." 605 F. App'x 514, 519 (6th Cir. 2015); *see* Maj. Op. at 10. That statement appears in the court's discussion of the need to weigh narcotics' potential benefits against their potential risks—a principle applicable to any medical treatment. As *Baker* said, "a reviewing court is asked to pass judgment on the attempts by prison medical staff to navigate between the Scylla of debilitating pain and the Charybdis of addiction to prescription drugs." 605 F. App'x at 519; *see also id.* ("[A] particular response to a prisoner's substantial risk of serious harm might either 1) fail to mitigate the risk or 2) create or enable a different substantial risk of serious harm to the prisoner.").

Applying this benefit-risk principle, the *Baker* court said that the facts there did not show deliberate indifference. *Id.* at 520. The plaintiff in that case had a documented history of substance-use issues. *See id.* at 520. Medical staffers observed him "acting in ways inconsistent with his claims of constant and debilitating pain." *Id.* Several physicians, including specialists, examined him for his reported pain and reviewed his medical information before determining that narcotics were unwarranted. *See id.* at 515–17. And the plaintiff's purported need for narcotics was "based only upon his 'personal experience' and 'information and belief' that methadone is the only adequate means of treatment." *Id.* at 520.

Those facts stand in stark contrast to the facts of this case. Unlike in *Baker*, the majority here points to no "objective findings" by medical staff that were "inconsistent with [Whyde's] subjective complaints" of pain. *Id.* at 516. Nor does it point to evidence that any medical staff examined Whyde to determine his need for opioid medications to treat his chronic pain.[4] In this respect, the health appraisal that Burgess conducted appears limited to asking Whyde about his medical history, reading his vital signs, confirming his reported prescriptions with his outside pharmacies, and communicating this information to Eldridge. Eldridge never examined Whyde or arranged for someone to examine Whyde for his reported pain. And Eldridge neither testified, nor argues before this court, that his decision to stop Whyde's treatment with opioid medications was based on an individualized clinical assessment. Rather, Eldridge's decision was based on the Health District's blanket policy prohibiting opioids in the jail, regardless of how much pain a detainee might suffer as a result—in other words, a non-medical reason. *Cf. Blackmore v.*

---

[4] The majority contends that this "misapprehends the nature of Whyde's claim," which arises from withdrawal, rather than "the underlying pain for which he was originally prescribed opioids." Maj. Op. at 11 n.1. But the underlying pain for which Whyde obtained an opioid prescription is clearly relevant to whether forcing him into withdrawal (with or without a detoxification protocol) was appropriate.

*Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004) ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity."). And Whyde's purported need for opioid medications was not based solely on his word. Given that Eldridge knew Whyde had valid prescriptions from his outside physicians for high dosages of opioid medications, a jury could conclude that Eldridge understood that other medical professionals had examined Whyde and determined that the medications were necessary.

Further, *Brawner* concluded that a jury could reasonably find that a jail nurse was deliberately indifferent to the risk of a detainee suffering seizures in failing to ensure the detainee could access either her medications—three controlled substances, including narcotics—or adequate substitutes. *See* 14 F.4th at 597–98. It is thus not true that the Constitution always permits jail or prison staff to choose to wean a detainee or prisoner off such substances, as the majority's discussion of *Baker* might imply. And Whyde's opioid pain medications were controlled substances, not categorically forbidden ones. As a matter of regulation and medical practice, controlled substances are clinically appropriate—indeed, often necessary—to treat certain conditions. *See, e.g.*, Deborah Dowell et al., U.S. Dep't of Health & Hum. Servs., *CDC Clinical Practice Guideline for Prescribing Opioids for Pain—United States, 2022*, Morbidity & Mortality Wkly. Rep., Nov. 4, 2022, at 2, https://perma.cc/6LJ2-Z94Y (noting that while they carry risks, "[o]pioids can be essential medications for the management of pain"). The majority's unqualified reasoning would deprive many Americans in pretrial detention and prison of the medications they genuinely need.

The majority also contends that, even if Dr. Eldridge's conduct did violate the Constitution, "neither Whyde nor the dissent identifies a case that would have put Dr. Eldridge on notice that

his specific conduct was unlawful." Maj. Op. at 12. And it posits that *Murray* "is irrelevant to the qualified immunity analysis" because it was decided several years after the events that gave rise to this case occurred. *Id.* But "we are not required to find a case in which the very action in question has previously been held unlawful." *Darrah*, 865 F.3d at 374 (cleaned up). Rather, "in the light of pre-existing law, the unlawfulness must be apparent." *Id.* (cleaned up). And "this Circuit's precedent is clear that neglecting a prisoner's medical need and interrupting a prescribed plan of treatment, even for a relatively short period, can constitute a constitutional violation." *Id.* It was therefore clearly established that Eldridge's conduct was unlawful. *See id.* ("[I]t was 'clearly established' in 2011, at the time of Darrah's transfer to MCI, that neglecting to provide a prisoner with needed medication, choosing to prescribe an arguably less efficacious treatment method, and continuing on a treatment path that was clearly ineffective could constitute a constitutional violation.").

**IV.**

Responsibility for Eldridge's refusal to continue administering Whyde's prescribed opioids does not end with him. Because the Health District assertedly had a blanket policy against opioid medications in the jail, a jury could find the Health District liable for a constitutional violation, too.

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018). "The scope of that responsibility does not include *respondeat superior* liability: a municipality is liable only for its own wrongdoing, not the wrongdoings of its employees." *Id.* The plaintiff must "demonstrate that the alleged federal violation occurred because of a municipal 'policy or custom.'" *Helphenstine*, 60 F.4th at 323 (quoting *Monell v. Dep't of Soc. Servs.*, 436

- 32 -

U.S. 658, 694 (1978)). A "direct causal link" between a municipality's "deliberate conduct" and the "constitutional violation" is needed for the municipality to "be deemed the 'moving force' behind the violation." *Graham ex rel. Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)). "The upshot is that municipalities can be held liable for harms caused by direct actions of the municipalities themselves," as well as "harms caused by the implementation of municipal policies or customs." *Morgan*, 903 F.3d at 565.

In *Brawner*, this court held that a reasonable jury could find a county liable on a pretrial detainee's deliberate-indifference claim under facts similar to those here.[5] The court first concluded that a jury could find that a jail nurse was deliberately indifferent to the risk that the detainee would suffer seizures from abruptly discontinuing any of the three controlled-substance medications that outside physicians had prescribed. *See* 14 F.4th at 597–98. The court then concluded that a jury could find "that this violation was the result of the County's policies," *id.* at 597, including "the execution of [a] . . . no-controlled-substances polic[y]," *id.* at 598. It noted medical testimony that abrupt discontinuation could cause seizures as well as prior decisions "suggest[ing] that abrupt discontinuation of substances that could lead to withdrawal symptoms and potential seizures might pose constitutional problems." *Id.* at 599 (collecting cases). The court then reasoned that, because there was adequate time between the detainee's arrival at the jail and her seizures' onset for her to have received her medications or adequate substitutes, "a reasonable jury could find that [the nurse's] failure to treat [the detainee] appropriately was due to

---

[5] I note that the qualified-immunity inquiry is inapplicable to municipalities. *See Hart v. Hillsdale Cnty.*, 973 F.3d 627, 645 (6th Cir. 2020).

the County's application of the no-narcotics policy, which caused [the detainee's] injuries." *Id.* at 599–600.

Here, too, a reasonable jury could conclude that application of a Health District policy caused Eldridge's failure to treat Whyde adequately. As noted earlier, Eldridge testified that he could not give Whyde opioid medications because "[t]here[] [was] a policy that there were no opioids in the jail." R. 117, PID 947.[6] The Health District also admitted in response to Whyde's request under Federal Rule of Civil Procedure 36 that it "had a policy in place . . . prohibiting any inmate of the Erie County Jail from receiving any opioid prescription medication while housed in the facility." R. 137-6, PID 2866. And there was ample time for Eldridge to apply the policy: Whyde arrived at the jail on Monday, March 27, 2017, and reported his prescription medications to the booking officer. Burgess, the jail nurse, performed Whyde's health appraisal, confirmed his opioid prescriptions, informed Eldridge as much, and received treatment instructions from Eldridge the next day. And the jail transported Whyde to a hospital emergency department on April 1.

## V.

Summary judgment on Whyde's excessive-force claim against Kerr based on the takedown was also inappropriate.

To prevail on an excessive-force claim, a pretrial detainee must show that an official used force "purposefully, knowingly, or ('possibly') recklessly" and that the force was "objectively unreasonable." *Hale v. Boyle Cnty.*, 18 F.4th 845, 852 (6th Cir. 2021) (quoting *Kingsley*, 576 U.S.

---

[6] As the majority points out, Eldridge also testified that he would have put Whyde on a Clonidine protocol if Whyde "were not in the jail and presented to [Eldridge] as a patient with these levels of pain medications." R. 117, PID 946. But, later in his testimony, Eldridge also confirmed that if "th[e] medications were necessary to treat his pain … he just [would] have to suffer the pain in the jail." *Id.* at 947. In other words, even if Eldridge considered opioid medications medically necessary, he would have been bound by the Health District's policy.

at 396). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). It "take[s] account of the legitimate interests in managing a jail," as well as "policies and practices needed to maintain order and institutional security." *Id.* at 399–400. And it considers the totality of the circumstances, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397.

"[A]dditional factors" come into play when an official used force in "respond[ing] to a medical or mental health emergency":

> (1) whether the person [on whom the official used force] was experiencing a mental health or medical emergency, and whether that emergency created "an immediate threat of serious harm" to [that person] or others; (2) whether "some degree of force [was] reasonably necessary to ameliorate the immediate threat;" and (3) whether "the force used [was] more than reasonably necessary under the circumstances."

*Palma v. Johns*, 27 F.4th 419, 429 (6th Cir. 2022) (third and fourth alterations in original) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017)).[7]

Because the objective-reasonableness inquiry is just that—an objective one—"a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398.

---

[7] *Palma* involved an excessive-force claim under the Fourth Amendment, *see* 27 F.4th at 428, but "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard," *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015).

A jury could reasonably conclude that Kerr's takedown at the beginning of the officers' extraction of Whyde from his cell was objectively unreasonable. "The relationship between the need for the use of force and the amount of force," *id.* at 397, was tenuous. Kerr's ostensible goal was to handcuff Whyde—who was at the time calm, isolated in his cell, and facing four other officers, as apparent from video evidence of the extraction—and lead him to a restraint chair outside the cell. "[T]he extent of [Whyde's] injury," *id.*, is also notable. He has put forth evidence that he suffered a forehead abrasion and contusion and a traumatic brain injury. And Kerr did not try "to temper or to limit the amount of force," *id.*, by first grabbing Whyde's wrists or using a chemical agent, for example. There is some evidence suggesting that not trying these other measures first was inconsistent with Erie County Sheriff's Office policy. *See Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015) ("Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases . . . .").

The majority says that Kerr's takedown was necessary "to ensure order and security in the jail." Maj. Op. at 17; *see also Kingsley*, 576 U.S. at 399. But a reasonable jury could conclude otherwise. Neither the majority nor Kerr cites the testimony of any officer who thought that Whyde threatened institutional security or order, and "nothing in the facts [otherwise] suggests a loss of discipline or order at the time." *Coley v. Lucas Cnty.*, 799 F.3d 530, 539 (6th Cir. 2015). Whyde was alone, contained in his cell, and facing five officers. Scott Hamernik, the officer who arranged for and oversaw the cell extraction and subsequent use of the restraint chair, testified that officer safety did not motivate the officers' decisions. Whyde's hitting the door and windows of his cell, which allegedly gave rise to the decision to place him in the restraint chair, had stopped well before the takedown, and he testified that he was not hitting the glass hard enough to break it and was making noise to call over an officer out of distress from his hallucinations of monkeys

threatening to kill him. Another officer, Jason Beatty, testified that hitting a cell door and window is "a normal way for inmates . . . to get [officers'] attention," and "all the inmates do it." R. 111, PID 643.

To justify Kerr's takedown, the majority further reasons that Whyde "actively resisted the officers' orders" to put his hands through the food chute of his cell door so the officers could handcuff him. Maj. Op. at 16. It says that Whyde "also refused to comply with both of Officer Kerr's instructions to 'turn around'" after Kerr entered the cell, and that Whyde instead "faced forward and said something indiscernible to Kerr." *Id.*

"Active resistance" consists of "some outward manifestation" of "volitional and conscious defiance." *Shumate v. City of Adrian*, 44 F.4th 427, 443 (6th Cir. 2022) (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)). It includes the "physical[]" acts of "struggling with, threatening, [and] disobeying officers." *Kent v. Oakland Cnty.*, 810 F.3d 384, 392 (6th Cir. 2016) (quoting *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)). It also includes some acts of verbal hostility. *See Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015). Because "noncompliance alone does not indicate active resistance," however, "something more" typically must accompany mere words to qualify as resistance—for example, when verbal hostility is "the final straw in a series of consciously-resistive acts" and "include[s] a statement that the [speaker] would fight the officers so that they would have a reason to kill [the speaker]." *Id.* (cleaned up). The published decision and one of the unpublished decisions the majority cites illustrate this distinction. *See Cretacci v. Call*, 988 F.3d 860, 870 (6th Cir. 2021) (disobeying order to get on the ground by standing up and yelling); *Earnest v. Genesee Cnty.*, 841 F. App'x 957, 958–61 (6th Cir. 2021) (concluding that an officer's takedown was reasonable after the officer found a drunk driver initially unresponsive in a crashed car, the driver subsequently swung his arm at an EMT,

the driver physically resisted efforts to remove him from the vehicle and toward a stretcher, and the officer repeatedly instructed the driver to put his hands behind his back).

Whyde passively—not actively—resisted. No one contends that Whyde verbally threatened the officers. Even if he said that he would not turn around for handcuffing and accordingly stood still, merely "refus[ing] to comply with an officer's command and verbally indicat[ing] as much" is not active resistance. *Kent*, 810 F.3d at 393; *see also Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (reversing summary judgment on excessive-force claim based on leg sweep due to factual disputes, including whether the plaintiff "left the scene of an accident or simply wandered away in a stupor due to [a] seizure"); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *5 (6th Cir. Mar. 15, 2023) (concluding that summary judgment was unwarranted because a plaintiff's "attempt[ ] to pull his hand away when [an officer] initially reached for his arms . . . could be considered minimal, passive resistance that cannot justify the Officers' uses of force," including a takedown); *Rudlaff*, 791 F.3d at 641 ("[Active resistance] includes refusing to move your hands for the police to handcuff you, *at least if that inaction is coupled with other acts of defiance*." (emphasis added)).

Further, viewing the facts in the light most favorable to Whyde, Kerr's takedown contravened clearly established law. This court has "determined that the use of a takedown maneuver, in a variety of scenarios, can amount to excessive force"—including, for example, when a detainee has "merely insulted an officer, refused to comply with orders, and continually raised his hand." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 581 (6th Cir. 2022) (collecting cases). Indeed, since well before the events in this case, it has been "'beyond debate' that performing a takedown on a detainee who is" not actively resisting is objectively unreasonable. *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)

(per curiam)); *see also Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022) ("It has been clearly established for several years in the Sixth Circuit that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest."); *Guy v. Metro. Gov't of Nashville & Davidson Cnty.*, 687 F. App'x 471, 476 (6th Cir. 2017) (concluding that it was clearly established by 2013 that using a chemical agent on a non-threatening and passively resisting pretrial detainee was excessive).

## VI.

Finally, I would vacate the grant of summary judgment to Burgess, Eldridge, and Kerr on the claims for intentional infliction of emotional distress under Ohio law.

Ohio law grants the employees of political subdivisions a limited immunity from civil liability for "any act or omission in connection with a governmental or proprietary function." Ohio Rev. Code Ann. § 2744.03(A). But employees are not immune for conduct (1) "manifestly outside the scope of [their] employment or official responsibilities"; (2) done "with malicious purpose, in bad faith, or in a wanton or reckless manner"; or (3) for which a statute "expressly impose[s]" liability. *Id.* "When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, [a court] may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)).

The district court followed this reasoning in granting summary judgment on the state-law claims. Because the "statutory immunity defense stands or falls with the[] federal qualified immunity defense," *id.* at 760, I conclude that the district court's grant of summary judgment on

the state tort claims against Burgess, Eldridge, and Kerr based on its reasoning regarding qualified immunity was improper.

The defendants contend that, even if statutory immunity does not apply, Whyde's claims do not have merit, and this court should affirm regardless of its disposition on qualified immunity. But this court is one "of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005).

\*     \*     \*

For the reasons stated, I would reverse the grant of summary judgment on the deliberate-indifference claims against Burgess, Eldridge, and the Health District and the excessive-force claim against Kerr, and I would vacate the judgment on the state-law claims against Burgess, Eldridge, and Kerr and remand for further consideration.